**Hortencia JONES et al.**

v.

**LATEXO INDEPENDENT SCHOOL DISTRICT et al.**

**No. TY–80–219–CA.**

United States District Court,
E. D. Texas,
Tyler Division.

Sept. 3, 1980.

---

Patrick A. Mueller, Robert B. O'Keefe, East Texas Legal Services, Nacogdoches, Tex., Virginia M. Schramm, Dwight Cook, East Texas Legal Services, Tyler, Tex., for plaintiffs.

James W. Turner, Crockett, Tex., for defendants.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

On April 11, 1980, the student body at the school operated by the Latexo Independent School District was subjected to the super-sensitive nose of "Merko", a dog trained to detect the odor of marijuana and other narcotics, as well as various other substances. Those students designated by Merko to be emanating such odors were subsequently searched by school authorities. Merko also sniffed the students' automobiles, which were parked in the school parking lot, in an effort to detect the odor of contraband. Vehicles singled out by the dog were thoroughly searched. As a result of this procedure, six students were suspended from school for possession of "drug paraphernalia" on campus in violation of school regulations.

Plaintiffs in this action are three of the suspended students, all siblings, and their parent. They challenge the school's actions, demanding injunctive and declaratory relief, and likewise damages under 42 U.S.C. § 1983. Their complaint, originally filed on July 9, 1980, and amended on August 18, 1980, alleges that the sniffing carried out by Merko and the resulting searches violated their fourth amendment rights. The plaintiffs also allege that their suspension from school on the basis of evidence obtained through such procedures, and without constitutionally-mandated due

process of law, violated the fourteenth amendment.[1]

An evidentiary hearing on plaintiffs' motion for a preliminary injunction consumed three days beginning on August 18, 1980, during which extensive oral testimony and documentary exhibits were presented. It is on the basis of that factual record that the plaintiffs' motion has been decided.

## FACTUAL BACKGROUND

On March 17, 1980, the School Board of the Latexo Independent School District voted to employ the services of Security Associates Incorporated (SAI) to combat what it perceived to be a growing problem of drug abuse in the Latexo public school. SAI, a private corporation, proposed to inspect the school's students and property for contraband periodically, on unannounced occasions, with the aid of a "sniffer dog" trained to detect a wide variety of illicit odors.[2] Prior to the first such inspection, the student body at Latexo attended an assembly program designed to deter on-campus drug use. At the assembly, defendant Acker, the School Superintendent, explained the rules prohibiting the possession of drugs, drug paraphernalia, tobacco, and other contraband on campus. SAI personnel narrated a slide presentation depicting the dangers of drug abuse. Merko, the trained "sniffer dog" and Kim Lounsberry, the dog's handler or "interdictor", were also present. Together, they demonstrated Merko's ability to ferret out hidden contraband. Superintendent Acker warned the students

that Merko would be making surprise visits to the campus to search for drugs and other contraband.

On April 11th, Merko and Ms. Lounsberry appeared at the Latexo school to conduct their first inspection of the campus. Along with Superintendent Acker and a teacher, Ms. Dunn, they moved from classroom to classroom where the students sat at their desks. While the students remained seated, Merko, accompanied by his handler, walked up and down the aisles in the room sniffing each child in turn before departing. If Merko detected a target odor (contraband of some description) emerging from any student, he "alerted" (signaled) his handler, who informed Mr. Acker of the suspect's identity after the dog left the classroom. The dog then proceeded to the student parking lot where it employed its sensitive nostrils to locate additional illicit smells.

Two of the plaintiff students, Scott and Michael Jones, were singled out by Merko during the class-by-class hunt for contraband. They, like all other students so selected by the dog, were removed from class and told to empty their pockets. A cigarette lighter was taken from Scott. The search of Michael's pockets revealed a hair clip which appeared to be burnt and a bottle of "Sinex" nasal spray. The vehicles driven to school by Scott and Michael were also picked out by Merko and searched. Items identified by Kim Lounsberry as "roaches" (the tag ends of marijuana cigarettes) were found in both vehicles.[3] A plastic box iden-

---

1. Several other constitutional infractions are alleged as well. Plaintiffs claim that the school's drug use policy is vague, overbroad, and not sufficiently disclosed to the public. They also assert that the school rules at issue were enforced against them in an arbitrary and discriminatory manner on the basis of their national origin (Mexican–American). The court finds no merit in either of these allegations. Plaintiffs further claim that the defendants' policy of reducing their course grades for days absent while suspended from school violates the Texas Education Code. In light of the conclusions hereafter reached on plaintiffs' federal claims, this issue of state law need not be reached.

2. These dogs can apparently be trained to respond to any specific odors. There was no

conclusive evidence offered about which particular smells would evoke a response in Merko, the animal used at Latexo. It was suggested, however, that the presence of such substances as tobacco, lighter fluid, and non–prescription drugs might have caused the dog to react the same as if he had detected marijuana or narcotics. The odor of a female dog in heat, a cat, or other animal might also cause a "sniffer dog" to become excited, the same reaction he was trained to exhibit in response to the smell of drugs.

3. None of the items found during these searches was ever scientifically tested for the actual presence of marijuana or any other illicit drug. SAI had the capability to conduct such tests, but school officials never requested that they be carried out. The items taken from the

tified by Ms. Lounsberry as a case for carrying "joints" (marijuana cigarettes) was also found in the vehicle Scott had brought to school.

Following the vehicle searches, Superintendent Acker summoned plaintiff Michele Jones from class. Merko had previously sniffed Michele during his tour of the classrooms without "alerting" on her. When Michele arrived at the parking lot, her purse was searched. A small piece of metal tubing and a hemostat, identified by Ms. Lounsberry as "drug paraphernalia", were found and taken from her at that time.

Superintendent Acker informed the three Jones children that they had been found in possession of drug paraphernalia and other contraband in violation of school rules. He gave them an opportunity to rebut the charges orally. Following a brief discussion during which all three children denied that the items seized had been used in connection with drugs, they were suspended from school for a period of three days and sent home.[4] Superintendent Acker informed Mrs. Jones by telephone of the reason for the suspension and met with her and her three children on April 14 to discuss the matter more extensively. No hearing as such was ever held, nor were any of the plaintiffs informed that they had a right to appeal the Superintendent's decision to the School Board.

Pursuant to school policy, three points for each day missed due to suspension were deducted from the course grades of each student for the final quarter of the school year. As a result of the nine point penalty imposed on Scott Jones, it became mathematically impossible for him to pass Ameri-

can History, a required course, before he took the final examination. Faced with the inevitability of failure, this high school senior declined to take his final examination in American History and in two other courses he was enrolled in. As a result, Scott failed to graduate with his classmates in June. The other two Jones children were able to pass all their courses despite the grade penalty resulting from their suspension.

Merko and his handler paid several subsequent surprise visits to the Latexo school during which the procedure described above was generally repeated. On June 23, 1980, the Latexo School Board voted to rehire SAI and its canine detection service for the 1980-81 school year beginning on September 2, 1980.

## DISCUSSION

### I. *Jurisdiction.*

▇ The blanket inspection carried out by the "sniffer dog" and the resulting searches of selected students and private vehicles constituted state action cognizable under 42 U.S.C. § 1983. School boards, no less than other state entities, are subject to the commands of the fourteenth amendment, *Board of Education v. Barnette*, 319 U.S. 624, 637, 63 S.Ct. 1148, 1185, 87 L.Ed. 1628 (1943), and are amenable to suit. *Kingsville I.S.D. v. Cooper*, 611 F.2d 1109, 1112 (5th Cir. 1980). While the doctrine of *in loco parentis* places the school teacher or employee in the role of a parent for some purposes, that doctrine cannot transcend constitutional rights. *Picha v. Wielgos*, 410 F.Supp. 1214, 1218 (N.D.Ill.1976); *Bellnier v. Lund*, 438 F.Supp. 47, 51 (N.D.N.Y.1977).

---

Jones children have been subsequently misplaced and possibly lost. Thus, the sole evidence that any of these items were, in fact, drugs or drug paraphernalia was the opinion relayed to Superintendent Acker by Kim Lounsberry, the dog's handler, at the scene. Ms. Lounsberry, who did not testify at the hearing, had approximately one year of experience with SAI at the time of these events and had completed a training program in drug detection and other skills, conducted by her company, lasting about four weeks.

4. On Tuesday, April 15th, Superintendent Acker agreed to reduce the students' suspension to two days and readmit them to school. Scott Jones, relying upon the three day suspension previously imposed, had committed himself to work for a neighbor on that day. He returned to school on Wednesday after what was, effectively, a three day suspension. The other two children returned to school on Tuesday, missing only two days of class.

Thus, the individual defendants implementing School Board policy, like the School District itself, are legally accountable for any constitutional violations they might have committed in the performance of their public duties.

■ The fact that some of the challenged actions were carried out by employees of SAI, a private corporation, does not lessen the degree of state involvement. The entire drug detection program at the Latexo school was initiated and implemented at the direction of the School Board and with the active involvement of Superintendent Acker and other school personnel. At the very least, the school was a joint participant in the program at all times, rendering the challenged conduct state action under the fourteenth amendment. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961). Moreover, the students subjected to Merko's sniffing and the subsequent search of their pockets and belongings were present in school as required by the state's compulsory attendance law, Tex.Educ.Code Ann. § 21.-032 (Vernon 1972). They were thus prohibited from leaving to avoid the search had they wished to do so.

■ Plaintiffs seek to invoke the jurisdiction of this court under 28 U.S.C. § 1343(3). Since the suit would allegedly redress the deprivation, under color of law, of rights secured by the Constitution, jurisdiction under that statute must be exercised unless the federal question alleged is clearly immaterial or wholly insubstantial. *Walsh v. Louisiana High School Athletic Assoc.,* 616 F.2d 152, 156 (5th Cir. 1980). Neither of those barriers to federal jurisdiction is present here.

**5.** The rules, which appear at page FNCE/FNCF (LOCAL) of Plaintiff's Exhibit 6, read as follows:

Any student enrolled in the schools of the District who is found by school staff or law officials to be under the influence of, or in the possession of, narcotics or other dangerous or regulated drugs, without a doctor's prescription, during the school day may be suspended for the remainder of the school year after being afforded due process. These

## II. *The School's Anti–Drug Policy.*

The School Board's concern over the problem of drug abuse in the Latexo Independent School District was most appropriate. Narcotics and other dangerous drugs have no place in our public schools. In the hands of children, the use of such substances may cause serious physical or psychological harm. *See, e. g., Fisher v. Burkburnett I.S.D.,* 419 F.Supp. 1200 (N.D.Tex. 1976) (drug overdose at school).

■ The principle that school discipline is primarily entrusted to the local schools is well established. The Supreme Court wrote in *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969):

The Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.

*See also Dunn v. Tyler I.S.D.,* 560 F.2d 137, 145 (5th Cir. 1972). In carrying out their responsibility to maintain the health and safety of public school students within a productive learning environment, the independent school districts of the State of Texas have broad discretion to enact rules and regulations governing student conduct while school is in session. That grant of power is codified at § 23.26 of the Tex. Educ.Code Ann. (Vernon 1972). Under that statute, school boards are empowered to make any rules which further the educational process as long as they are neither arbitrary, unreasonable, nor contrary to law. *Wilson v. Abilene I.S.D.,* 190 S.W.2d 406, 412 (Tex.Civ.App.–Eastland 1945).

Plaintiffs claim that the rules against the possession of drugs and drug paraphernalia promulgated by the School Board were unconstitutionally vague and overbroad.[5]

drugs include amphetamine, Methedrine, barbiturates, heroin, LSD, mescaline, peyote, psilocybin, DMT, etc., and marijuana, also to include the misuse of glue, paint thinner, lighter fluid, gasoline, etc. Also prohibited is any paraphernalia associated with drug use, such as roach holders, pipes, medallions which convert to paraphernalia, hoses, syringes, and the like.

They also maintain that fair notice of these rules was not provided to them. In light of the disposition of the fourth amendment issue here made, it is unnecessary to rule upon these specific constitutional claims.

III. *The Constitutionality of the "Sniffer Dog" Inspection.*

Even if the School Board's rules were entirely valid, the defendants would not be permitted to violate constitutional standards in attempting to enforce them. Students, like all other "persons" under our Constitution, have fundamental rights which must be respected by state authorities. *Tinker v. Des Moines School District*, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969). Those basic liberties, embodied in the Bill of Rights, have been extended to the states by the fourteenth amendment. *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). If the dog's sniffing of the students and their property was an unreasonable search under the Fourth Amendment, a constitutional violation has occurred and the victims are entitled to redress.

This difficult question must be analyzed in the context of the history and purposes of the fourth amendment. That constitutional guarantee, once limited in scope to physical trespasses into legally-protected areas, has evolved into a safeguard against all intrusions by the state upon the privacy of the individual. *Compare Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) with *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The so-called "right to be let alone", championed by Justice Brandeis in his dissent in *Olmstead*, 277 U.S. at 478, 48 S.Ct. at 572, has been accepted by a majority of the Court. *See, e. g., Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). As the Court wrote in *Schmerber*,

The overriding function of the fourth amendment is to protect personal privacy and dignity against unwarranted intrusion by the state.

*Id.* at 767, 86 S.Ct. at 1834.

In deciding whether the inspection by Merko, the "sniffer dog", violated the fourth amendment rights of plaintiffs, a twofold test is required. First, it must be determined whether a search of constitutional dimension actually occurred. If it is found that a search occurred, the second issue is whether or not the search was reasonable.

Under the Supreme Court's ruling in *Katz*, the fourth amendment is implicated whenever the state intrudes upon an individual's reasonable expectation of privacy. What a person does in his own home; what he says over the telephone; and what he carries in his pockets are presumptively protected from the prying eyes and ears of the state. *See Stanley v. Georgia; Katz v. United States; Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This limitation upon arbitrary governmental power is one of the prime attributes of a free society.

But just as the fourth amendment protects personal privacy against intrusion, it does not require the state to close its eyes to that which is exposed in public. *Katz*, 389 U.S. at 351, 88 S.Ct. at 511. Under the "plain view" doctrine, the police or other state officials may seize contraband or evidence of crime which comes within their vision as they go about their business in a legitimate fashion. *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (*per curiam*). The rationale supporting this doctrine is that what an officer sees before him does not constitute a search. In the language of *Katz*, an individual has no reasonable expectation of privacy in that which he exposes to public observation. The plain view principle has been extended to odors and sounds perceived by state officials as well. *United States v. Walker*, 522 F.2d 194, 196

(5th Cir. 1975) (odor of marijuana); *Ponce v. Craven*, 409 F.2d 621, 625 (9th Cir. 1969) (conversation emanating from open window).

The development of sophisticated electronic devices and other technology to enhance or supplement human perception has raised the issue of how far the plain view concept may be stretched before it swallows up the protection of privacy ostensibly afforded by the fourth amendment. In *Katz*, the Supreme Court responded to that issue by holding that the use of an eavesdropping device to monitor an otherwise inaudible conversation constituted a search of constitutional dimension. Conversely, the use of a flashlight to view objects otherwise hidden from sight at night falls within the scope of plain view. *Marshall v. United States*, 422 F.2d 185, 189 (5th Cir. 1970).

Between these two poles lie a number of other surveillance devices, including the use of the "sniffer dog" in the instant case, which enhance or supplement the human senses of hearing, sight, and smell. The differences between the electronic surveillance undertaken in *Katz* and the flashlight employed in *Marshall* shed light on how the search issue should be resolved in these more difficult situations. First, as the Court of Appeals observed in *Marshall*, the flashlight simply enabled the police officer to see in darkness that which he could have viewed plainly in daylight. By contrast, the telephone conversation picked up by a microphone would, without such technology, never have been audible to human hearing. Second, the flashlight merely enhanced human perception in the darkness while the electronic "bug" substituted for human hearing altogether. Most importantly, the use of a flashlight differs sharply from electronic surveillance with respect to relative expectations of privacy within our society. Most persons in this country own flashlights, and the use of such devices by private citizens and police officers alike has become both widespread and socially acceptable. Electronic eavesdropping, on the other hand, violates our individual reliance upon personal privacy in a fundamental way. This is admittedly an *ad hoc* distinction based upon prevailing social mores, but it is the form of analysis embodied in the Supreme Court's decision in *Katz*.

In wrestling with these variables, courts have had the greatest difficulty deciding cases where the device or surveillance method employed involved a relatively slight intrusion upon personal privacy. In *United States v. Holmes*, 521 F.2d 859 (1975), a panel of the Fifth Circuit held that the attachment of an electronic "beeper" to the outside of a suspect's vehicle to track its movement was a search cognizable under and violative of the fourth amendment. Employing the form of analysis suggested in *Katz*, the Court found that though the intrusion was slight, an individual had a reasonable right to expect that the state would not attach a tracking device to his car. *Id.* at 866. The panel's decision in *Holmes* was affirmed by the full Circuit, sitting *en banc*, on an equally–divided vote. *United States v. Holmes*, 537 F.2d 227; (5th Cir. 1976) (*per curiam*). Recently, another Fifth Circuit panel followed *Holmes* in holding that the use of a "beeper" constituted an invasion of privacy sufficient to trigger the guarantees of the fourth amendment. *United States v. Michael*, 622 F.2d 744 (5th Cir. 1980). *See also U. S. v. Bailey*, 628 F.2d 938 (6th Cir. 1980).[6]

The use of a "sniffer dog" by defendants in the instant case was a substantially greater intrusion upon the personal privacy of plaintiffs than the attachment of a "beeper" in *Holmes* and *Michael*. First, the students themselves, not merely their vehicles or possessions, were subjected to canine scrutiny. Moreover, Merko was able to detect odors completely outside the range of the human sense of smell.[7] The dog thus

---

6. The use of a magnetometer to detect metal on airline passengers has also been found to constitute a search, albeit a reasonable one. *United States v. Albarado*, 495 F.2d 799, 806, 808–809 (2nd Cir. 1974).

7. Mr. David Cochran, Head of the Canine Division of SAI, described Merko as "a giant olfactory nerve."

replaced, rather than enhanced, the perceptive abilities of school officials. In that respect, the dog was far more analogous to an electronic "bug" than to a flashlight, which merely augments human sight in particular lighting conditions.

▮▮▮▮ The dog's inspection was virtually equivalent to a physical entry into the students' pockets and personal possessions. In effect, he perceived what the students had secreted and communicated that information to his handler. By way of analogy, if the police approached citizens on the street with a portable x–ray machine to discern what they were carrying in their pockets, purses, and briefcases, surely such a procedure would be a search under the fourth amendment. Yet that was precisely the way in which Merko was employed. Like an x–ray machine, his superhuman sense of smell invaded the students' outer garments and detected the presence of items they were expecting to keep private.[8] All citizens have a reasonable expectation that their privacy will not be intruded upon by electronic surveillance, x–ray machines, or sniffing dogs at the whim of the state. The use of the "sniffer dog" in the Latexo school was thus a search under the fourth amendment.

▮▮▮▮ The designation of the sniffing conducted by Merko as a search does not end the constitutional inquiry, for the fourth amendment prohibits only those searches which are "unreasonable".[9] *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960). The constitutional validity of any search depends upon the outcome of a balancing test between the competing interests of public need for the search on one hand and the individual's right to personal security on the other. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968);

*Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (*per curiam*). The implementation of this test requires the court to examine the totality of circumstances surrounding the search at issue. *Wanger v. Bonner*, 621 F.2d 675, 681 (5th Cir. 1980). Relevant factors to be considered include the scope of intrusion, the manner of intrusion, the justification for the search, and the place where it is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

The degree of intrusion committed by Merko's sniffing the students and their property was somewhat less extensive than that stemming from a physical search. No laying on of hands was contemplated during the procedure until the dog had completed his tour of each classroom. In that respect, the intrusion more closely resembled electronic bugging or x–rays, which convey private information without a discernible physical intrusion. Moreover, since Merko only signalled his trainer if contraband was detected, this type of search was more limited in nature than other surveillance methods which pick up private information, both incriminating and non–incriminating, in an indiscriminate manner.

On the other hand, the use of an animal such as Merko to conduct a search may offend the sensibilities of those targeted for inspection more seriously than would an electronic gadget. Merko, a German Shepherd, is a large animal who had been trained as an attack dog. Testimony by the school's principal, Mr. Emmons, indicated that the dog "slobbered" on one child in the course of a search. The dog's trainer acknowledged that Merko might physically touch a child during a search if the dog became overly excited. Such a tool of surveillance could prove both intimidating and frightening, particularly to the children,

---

8. It is of no moment that the dog sniffed odors which were in the air after emanating from the students. The same could be said of the sound waves picked up by the electric "bug" in *Katz*. That form of analysis, predicating a search upon a physical trespass rather than invasion of privacy, has been discarded.

9. Defendants erroneously state in their post–trial brief that "[i]f the Court were to conclude the act of sniffing to be a search under the fourth amendment then the fourth amendment rights of all students have been violated." That formulation overlooks the requirement of reasonableness inherent in the Constitution.

some as young as kindergarten age, enrolled at Latexo. Hence, the degree of intrusion caused by the search was significant, far greater than that which the Fifth Circuit has found unacceptable in the "beeper" cases.

 Defendants particularly emphasize that the student body was warned by Superintendent Acker that Merko would be conducting surprise inspections of the school prior to the search conducted on April 11th. They suggest that such a disclosure greatly diminished any expectation of privacy plaintiffs might have held prior to that time. But the mere announcement by officials that individual rights are about to be infringed upon cannot justify the subsequent infringement. Again through the medium of comparison, if the Government announced that all telephone lines would henceforth be tapped, it is apparent that, nevertheless, the public would not lose its expectation of privacy in using the telephone.

 The search at the Latexo school cannot be analogized to passenger searches at airports, where citizens are warned that they will be subject to search should they choose to board a plane. See, e. g., United States v. Edwards, 498 F.2d 496 (2nd Cir. 1974). In such circumstances, the individual is free to avoid the search by refraining from air travel. But the students at the Latexo school had no means of avoiding the impending searches, after they were announced, had they wished to do so. School attendance is compelled by law, and no students were permitted to leave their classrooms before Merko commenced sniffing. The search was mandatory for all. Thus, the reasonable expectation of students to be free from such an intrusion survived all warnings by school officials that such searches were to take place.

 A principal factor in evaluating the reasonableness of this particular search is its sweeping, undifferentiated, and indiscriminate scope. The fourth amendment was designed, in large part, to prevent wholesale intrusions upon the personal security of our citizens. Davis v. Mississippi, 394 U.S. 721, 726, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969). Although the probable cause standard embodied in the Constitution may be relaxed somewhat when limited intrusions are involved, some "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant . . . intrusion" on an individual by the state must be demonstrated. See, e. g., Terry v. Ohio, 392 U.S. 1, 21, fn. 18, 88 S.Ct. 1868, 1880, fn. 18, 20 L.Ed.2d 889 (1968). As the Court observed in Terry,

This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.

Id., fn. 18.

 In keeping with the foregoing, the state must have a basis for subjecting a particular person to search before intruding upon his privacy. Neither the police nor any other official may stop and search all persons present at a particular location simply because of a generalized suspicion that somebody in attendance might possess contraband. See Carroll v. United States, 267 U.S. 132, 153–154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). The blanket search or dragnet is, except in the most unusual and compelling circumstances, anathema to the protection accorded citizens under the fourth amendment. The state may not constitutionally use its authority to fish for evidence of wrongdoing. State of Texas v. Gonzales, 388 F.2d 145, 148 (5th Cir. 1968).[10]

10. The need for individualized suspicion prior to search or seizure has been discussed extensively by the Supreme Court in the context of border patrols. The Court has held that searches conducted by roving patrols without specific evidence of wrongdoing by the target individuals are unreasonable. Almeida–Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Even a brief stop for questioning carried out by such a patrol, far less intrusive than the sniff–search involved in the case at bar, requires reasonable suspicion based upon individual behavior. United States v. Brignoni–Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The Court has authorized brief stops of all vehicles passing through

The defendants in this case ignored the need to ascertain individualized suspicion prior to intruding upon the privacy rights of the students at Latexo. There was not a shred of evidence at the time of the sniff–search on April 11th that any of the student–plaintiffs were in possession of drugs or any other contraband on school grounds. It was, instead, the purpose of the search itself to ferret out such evidence in order to justify a more extensive search of selected students and property. But the ultimate fruits of a search, however bountiful, cannot justify the intrusion after the fact. *United States v. Di Re*, 332 U.S. 581, 595, 68 S.Ct. 222, 228, 90 L.Ed. 210 (1948); *State of Texas v. Gonzales*, 388 F.2d 145, 148 (5th Cir. 1968). Just as the police could not lawfully bring Merko into a restaurant, football stadium, or shopping center to sniff–search citizens indiscriminately for hidden drugs, the school officials exceeded the bounds of reasonableness in using Merko to inspect virtually the entire Latexo student body without any facts to raise a reasonable suspicion regarding specific individuals.

The sniff–search of plaintiffs' vehicles, isolated from the search of the plaintiffs themselves, also exceeded the bounds of reasonableness. Under school regulations, students had no access to their vehicles while school was in session. Thus, the school's legitimate interest in what students had left in their vehicles was minimal at best. The search was conducted in a blanket, indiscriminate manner without individualized suspicion of any kind. The capabilities of the dog, in penetrating the closed doors of the vehicles in a manner far beyond the range of human senses, resembled those of an x–ray machine or bugging device. While the extent of personal intrusion was somewhat less serious than in the dog's sniffing each individual student, the combination of other factors place the vehicle searches on the wrong side of the constitutional line.

As mentioned above, the determination of reasonableness in each case must be made on an *ad hoc* basis. To date, five courts of appeals have approved searches by "sniffer dogs" in circumstances which contrast sharply with those presented by the case at bar. None of those cases support the reasonableness of defendant's indiscriminate search of the students at Latexo.[11]

fixed border checkpoints, *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), but only because it found the need compelling, the intrusion minimal, and no practical alternative means of inspection available. Moreover, the fixed nature of such checkpoints gives fair notice to travelers that they will be stopped at predictable times and locations, akin to the airport passenger searches approved in *United States v. Edwards*, 498 F.2d 496 (2nd Cir. 1974).

**11.** The five cases are: *United States v. Venema*, 563 F.2d 1003 (10th Cir.1977); *United States v. Solis*, 536 F.2d 880 (9th Cir.1976); *United States v. Bronstein*, 521 F.2d 459 (2nd Cir.1975) *cert. denied*, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976); *United States v. Race*, 529 F.2d 12 (1st Cir.1976); and *United States v. Fulero*, 498 F.2d 748 (D.C.Cir.1974) (*per curiam*). In *Venema*, the police had individualized suspicion before conducting a sniff–search of a storage locker. The target trailer in *Solis* also exhibited suspicious characteristics before being singled out for sniff–search. Talcum powder, frequently used to mask the scent of marijuana, was visible on the trailer frame. The court, which found that the "sniffer dog" was employed merely to corroborate other evidence of crime, stressed that the sniff–search was not indiscriminate in scope. *Id.* at 882. *Bronstein*, the Second Circuit case, involved the sniff–search of airline baggage after individualized suspicion had developed. The court found no reasonable expectation of privacy in baggage shipped by plane and emphasized that "Meisha [the "sniffer dog"] was not employed in a dragnet operation against all flight passengers . . . " *Id.* at 463. The court also stressed the difference in degree of intrusion between a baggage search and a sniff–search of persons themselves. *Id.* at 462, n.5. Judge Mansfield, concurring, asserted that wholesale sniff–searches of all baggage without individualized suspicion would violate the fourth amendment. *Id.* at 465.

The two remaining court of appeals cases also differ markedly in their facts from the case at bar. *Race* involved the sniff–search of freight, both domestic and foreign, arriving at a major airport from all over the world. While the search was indiscriminate in nature, it was, in effect, a border or customs search since it encompassed items from abroad. Those choosing to utilize such channels of transportation for their property voluntarily assume a diminished expectation of privacy. In *Fulero*, the police

The only case decided to date on facts even remotely resembling those now before the court is *Doe v. Renfrow*, 475 F.Supp. 1012 (N.D.Ind.1979) (*appeal pending*). The court's approval of a blanket high school sniff–search in that case stemmed from an erroneous view that the dog merely augmented or enhanced school officials in their own inspection of the school. *Id.* at 1022. As noted above, however, a "sniffer dog" actually perceives odors undetectable to humans, much as an electronic listening device picks up sounds inaudible to the human ear. *Doe v. Renfrow* has been justifiably criticized by legal writers on this and other grounds. *See* "The Constitutionality of Canine Searches in the Classroom", 71 *Journal of Criminal Law & Criminology* 1 (1980); Helfer, "Search and Seizure in Public Schools: Are Our Children's Rights Going to the Dogs?", 24 *St. Louis U.L.J.* 119 (1979).[12]

Despite the apparent unreasonableness of defendants' blanket sniff–search at the Latexo school, defendants make an additional argument which merits attention. Under the *in loco parentis* doctrine, school teachers and administrators have specific responsibility for the health, safety, and conduct of students during school hours which gives them authority to impose discipline and maintain order. *See Picha v. Wielgos*, 410 F.Supp. 1214, 1217–1221 (N.D.Ill.1976). Defendants suggest that the sniff–search was necessarily reasonable since it was carried out in the exercise of that power and in furtherance of valid school regulations.

▮ It is certainly true that the standards for a search in the public school context are considerably more lax than they are in the community at large. Courts have generally approved searches conducted in schools on the basis of "reasonable cause to believe" that contraband would be found, rather than requiring that the stricter standard of probable cause be met. *See, e. g., M. v. Bd. of Ed. Ball–Chatham C.U.S.D.*, 429 F.Supp. 288, 292 (S.D.Ill.1977). Moreover, a warrant may not be required for such a search in many cases when the school is pursuing its legitimate interest in maintaining a safe environment conducive to the learning process. *Bilbrey v. Brown*, 481 F.Supp. 26, 28 (D.Or.1979).

▮ But the doctrine of *in loco parentis* does not render the fourth amendment completely inapplicable to school searches, nor does it strip students attending school of their constitutional rights. *Picha v. Wielgos*, 410 F.Supp. 1214, 1218 (N.D.Ill. 1976). State–operated schools may not operate as enclaves of totalitarianism where students are searched at the caprice of school officials. Thus, while the unique role of education in our society is a factor to be taken into account in assessing the reasonableness of this search, it does not necessarily outweigh all other factors. Some articulable facts which focus suspicion on specific students must be demonstrated before any school search can be carried out. *Bellnier v. Lund*, 438 F.Supp. 47, 53 (N.D.N.Y.1977). That requirement was not met prior to the sniff–search conducted at Latexo.

▮ Defendants' indiscriminate search of plaintiffs and other students was not rendered constitutionally permissible because it took place on the campus of a

---

had individualized suspicion before ordering a sniff–search of a footlocker ticketed for cross-country shipment. The smell of mothballs, another substance commonly used to mask the odor of marijuana, was readily discernible when the trunk was brought into the bus terminal to be shipped.

None of these five cases involved a sniff–search carried out upon individual citizens. All but one concerned items in the stream of interstate commerce, manifesting a greatly reduced expectation of privacy. In four of the cases, the officials who ordered the sniff–search had particularized suspicion directed against specific individuals beforehand. None of these cases support the blanket search of individual students during class which was carried out at Latexo.

**12.** It should be noted that the strong evidence of widespread drug abuse at the high school inspected in *Doe v. Renfrow* far exceeded any evidence that Latexo students were using drugs. While this distinction is not, in itself, dispositive, it would necessarily alter the *ad hoc* balancing required to be carried out in assessing reasonableness on the facts of each case.

public school. The sniff–search conducted on April 11th was unreasonable under the fourth amendment, and since the search was carried out under color of state law, the constitutional rights of plaintiffs have been violated under the fourth amendment. Unless some other justification can be found to validate the subsequent searches of plaintiffs and their vehicles, those searches violated the fourth amendment as well.

### IV. The Validity of the Subsequent Searches.

There is no doubt that the physical searches of plaintiffs and their vehicles on April 11th resulted chiefly from the constitutionally deficient sniff–search. Except for the unreasonable employment of Merko's olfactory talents, the particularized suspicion needed to compel students to undergo such treatment would not have existed. Defendants suggest, as an alternative rationale, that all the plaintiffs consented to be searched. If consent were given, the requirement that reasonable suspicion or another quantum of proof be satisfied in advance would be excused. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973).

 To render such a search valid, consent must be freely and voluntarily offered. *Id.* at 227–228, 93 S.Ct. at 2047–2048. Voluntariness is a question of fact to be decided on the basis of the totality of circumstances. *United States v. White*, 617 F.2d 1131, 1134 (5th Cir.1980). Coercion, either express or implied, vitiates apparent consent. *Schneckloth*, 412 U.S. at 228, 93 S.Ct. at 2048. If state officials give any affirmative indication that an individual must agree to be searched, that, in itself, would establish the involuntariness of a subsequent search. *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

The search of plaintiffs at the Latexo school cannot be characterized as consensu-al under these standards. The targets of the search were children with limited experience in a threatening situation. Insubordination is a disciplinary offense under school rules. Accustomed to receiving orders and obeying instructions from school officials, they were incapable of exercising unconstrained free will when asked to empty their pockets and open their vehicles to be searched.[13] Moreover, plaintiffs were told repeatedly that if they refused to cooperate with the search, their mother would be called and a warrant procured from the police if necessary. These threats aggravated the coercive atmosphere in which the searches were conducted.

 A consideration of all relevant facts makes it evident that the plaintiffs did not freely and voluntarily consent to be searched. Since the fruits of the illegal sniff–search, the sole source of evidence placing the plaintiffs under reasonable suspicion, could also not be used as a justification, the physical searches of plaintiffs and their vehicles were unreasonable under the fourth amendment.

### V. The Legitimacy of Plaintiffs' Suspension from School.

 Having obtained evidence against the plaintiffs by means of an unconstitutional search, the defendants could not use that evidence as a justification for imposing punishment. Although criminal proceedings were never instituted against the students, the fourth amendment protects citizens against unreasonable invasions of privacy by government officials in the civil area as well. *Marshall v. Barlow's Inc.*, 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978); *see also Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). In determining the existence of a fourth amendment violation and effectuating an appropriate response, courts must not be misled by the legal classification of the proceeding

---

**13.** The students were never specifically asked if they would agree to be searched; they were merely told what to do. That the instruction may have come in the form of a question– "Would you empty your pockets?" rather than as a direct order–"Empty your pockets!" is not significant in light of all of the surrounding circumstances.

in which the violation occurred. *Knoll Associates, Inc. v. F.T.C.*, 397 F.2d 530, 534 (7th Cir.1968) (use of illegally obtained evidence by regulatory commission in civil proceeding invalid).

■ The primary vehicle for enforcing the strictures of the fourth amendment in our legal system is the "exclusionary rule," which prevents the use of unconstitutionally obtained evidence by the government in subsequent proceedings. *See, e. g., Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). While the exclusionary rule is most often employed in criminal cases, it has been resorted to on numerous occasions to redress fourth amendment violations in a variety of civil contexts as well. *See, e. g., Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965) (illegally obtained evidence inadmissible in civil forfeiture proceeding); *Pizzarello v. United States*, 408 F.2d 579 (2nd Cir.1969), *cert. den.* 396 U.S. 986, 90 S.Ct. 481, 24 L.Ed.2d 450 (1969) (fruits of illegal search conducted by IRS agents inadmissible in civil tax deficiency proceeding); *State of Iowa v. Union Asphalt & Road Oils, Inc.*, 281 F.Supp. 391 (S.D.Iowa 1968), *aff'd. sub nom. Standard Oil Co. v. Iowa*, 408 F.2d 1171 (7th Cir.1969) (fruits of unlawful search inadmissible in civil antitrust trial); *Powell v. Zuckert*, 366 F.2d 634, 640 (D.C. Cir.1966) (fruits of unlawful search cannot be used to justify discharge of federal employee). *See also Savina Home Industries v. Secretary of Labor*, 594 F.2d 1358, 1362–63 (10th Cir.1979) (dictum).

In a case comparable on its facts to this one, Chief Judge Fox of the Western District of Michigan refused to allow a state college to rely upon the fruits of an unlawful search of student rooms to discipline those students occupying rooms where contraband was found. *Smyth v. Lubbers*, 398 F.Supp. 777 (E.D.Mich.1975). "If there were no exclusionary rule in this case," Judge Fox pointed out, "[school] authorities would have no incentive to respect the privacy of its students." *Id.* at 794. He observed that students rarely have the means to pursue protracted damage actions to protect their rights and that school officials acting in good faith would, in any event, be immune from liability for damages under *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214. Judge Fox concluded that in such circumstances

> the exclusionary rule remains the only possible deterrent, the only effective way to positively encourage respect for the constitutional guarantee.

*Id.* That insightful analysis is equally applicable to the instant case.

The Supreme Court, in *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), declined to apply the exclusionary rule in a situation quite unlike that presented by the ·unconstitutional search of students in the Latexo school. In *Janis*, evidence unconstitutionally obtained by local police was turned over to federal authorities and used in a civil tax deficiency proceeding. The Court, noting the importance of deterrence as a prime objective of the exclusionary rule, found that deterrence was sufficiently served by the exclusion of the evidence from any criminal prosecution which might be brought against the defendant by either state or federal authorities. The Court stressed that the deterrent effect of applying the exclusionary rule would be particularly attenuated where the local officials accused of unlawful conduct were·unconnected with the sovereign seeking to use the evidence. *Id.* at 455, 458, 96 S.Ct. at 3032, 3034. Based on the particular circumstances of the case, the Court upheld the use of illegally–obtained evidence to compel the defendant to pay taxes allegedly owed to the government.

The instant case falls closer to *Plymouth Sedan* and the lower federal court cases cited above than to *Janis*. The plaintiff–students suffered a penalty as a result of the illegal searches carried out by defendants. Although the punishment imposed was non–criminal in nature, it was, nonetheless, a deprivation rather than merely the restitution of monies wrongfully retained, as in *Janis*. Moreover, the school officials who suspended the plaintiffs on the basis of the unlawfully obtained evidence were the very same individuals who planned and implemented the searches.

Excluding the use of such evidence from school disciplinary proceedings will directly and effectively deter unconstitutional conduct by these officials, in the manner contemplated by the Supreme Court in *Mapp.*

The failure to apply a corollary of the exclusionary rule in this context would leave school officials free to trench upon the constitutional rights of students in their charge without meaningful restraint or fear of adverse consequences. Such a result would be intolerable, particularly in our schools. As the Supreme Court has stated:

> [T]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.

*Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960).

Students look to teachers, school administrators, and others in positions of authority as models for their own behavior and development into responsible adults. Justice Brandeis' words apply with particular force to the acts of these defendants:

> Our government is the patient, omnipresent teacher. For good or for ill, it teaches the whole people by its example .... If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

*Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (dissenting).

 An illegal search is no less consequential under the fourth amendment because it is carried out by the Latexo School Board rather than by the Department of Justice. Such unwarranted invasions of personal privacy as are reflected in the record of this case can be effectively deterred only through a variant of the exclusionary rule. Applying such a standard here, the items seized as a result of the unconstitutional searches of plaintiffs and their property could not be used as grounds for subjecting these students to disciplinary measures.[14] Since there was no evidence that plaintiffs had violated school rules other than the fruits of those searches, their suspension from school and accompanying loss of grade points were unconstitutional. *See Thompson v. Louisville*, 362 U.S. 199, 206, 80 S.Ct. 624, 629, 4 L.Ed.2d 654 (1960) (state may not impose punishment absent evidence of guilt).[15]

## VI. *The Appropriateness of Preliminary Relief.*

Plaintiffs seek preliminary relief under Rule 65, F.R.Civ.P. The purpose of such an

---

**14.** Apart from the invalidity of the searches, serious doubts about the reliability of the evidence on which plaintiffs were suspended are raised by the evidence. While the items taken from plaintiffs might have been used in connection with drugs, they might also have been completely innocuous. That key question could have been easily resolved by scientific testing of the items, but no such tests were ever carried out. Rather than carefully cataloguing and storing the items for use as evidence in any subsequent administrative or judicial proceedings, the defendants carelessly turned the items over to SAI, where testimony showed they have been mislabeled and/or lost. The school's failure to confirm the on-the-spot opinion of Kim Lounsberry, the dog's handler, that the items seized were, in fact, "drug paraphernalia" constituted poor practice and perhaps a potential denial of substantive due process. *See Strickland v. Inlow*, 485 F.2d 186, 190 (8th Cir.1973).

**15.** The disposition of the fourth amendment issue makes it unnecessary to reach the procedural due process claims raised by plaintiffs.

Without resolving those claims, the court notes its skepticism about the adequacy of the procedures carried out by defendants prior to imposing punishment. *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), authorizes informal procedures for short–term school suspensions on the grounds that the level of deprivation in such cases is relatively slight. More extensive procedures are required for greater deprivations. In the instant case, plaintiffs were not only denied entrance to school for several days but also suffered a loss of grade points which lowered their academic standing and rendered them far more susceptible to failing their courses. The loss of points, coupled with a suspension, aggravates the penalty and necessarily triggers somewhat greater procedural safeguards under the fourteenth amendment than those accorded plaintiffs in this case. *See Goss v. Lopez*, 419 U.S. at 584, 95 S.Ct. at 741; *Williams v. Dade County School Board*, 441 F.2d 299, 301 (5th Cir.1971); *Hauk v. Tyler I.S.D.*, No. TY–80–55–CA (E.D.Tex.T.R.O. granted March 19, 1980).

extraordinary remedy is to prevent plaintiffs from suffering irreparable harm at the hands of defendants before a final determination on the merits is reached. *Exhibitors Poster Exch. v. National Screen Serv. Corp.*, 441 F.2d 560 (5th Cir.1971) (*per curiam*). In order to be entitled to preliminary relief, plaintiffs must make the following showings:

1. Plaintiffs have a substantial likelihood of success on the merits;
2. There is a substantial likelihood that plaintiffs will suffer irreparable harm unless relief is granted;
3. The threatened injury to plaintiffs by denial of relief outweighs the possible harm to defendants caused by the granting of relief; and
4. The granting of relief will serve the public interest.

*Barrett v. Roberts*, 551 F.2d 662, 665 (5th Cir. 1977).

Plaintiffs have satisfied all of these requirements. In light of the conclusion that the plaintiffs' suspension from school was unconstitutional, a probability of success on the merits is apparent. Scott Jones, saddled with a nine point grade penalty resulting from his suspension, was unable to pass American History and graduate high school.[16] Defendants have declined his requests to make up the examinations he missed last May. As a result, his immediate prospects for employment and skilled training have been significantly impaired.

Both Michael and Michele Jones remained enrolled at the Latexo school for the 1980–81 school year, scheduled to begin on September 2, 1980. The School Board has already rehired SAI and its canine–sniffing service for this school year. Unless preliminary relief is granted, these students will likely be subjected to additional blanket

sniff–searches in violation of their fourth amendment rights. For these reasons, there is a substantial threat of irreparable harm if relief is denied.

In balancing the equities, the scales tilt sharply in favor of plaintiffs. The defendants testified at trial that it would be little trouble for them to prepare makeup examinations for Scott Jones and to provide him with instructional materials in preparation for taking the tests. Defendants have demonstrated no possible harm which would result from a prohibition on conducting sniff–searches without some individualized suspicion directed against specific students.

On the other side of the equation, Scott Jones will be unable to obtain substantial employment or technical training without his high school diploma. It would be unfair to compel Scott to attend school for an entire additional semester, since he would probably have graduated last spring but for defendants' unconstitutional actions. Moreover, both Michele and Michael Jones will be subjected to repeated constitutional injuries throughout the school year if relief is denied.

The final test is whether or not relief will serve the public interest. In this case, the answer to that question is a resounding "Yes". Not only these plaintiffs, but all of their classmates at Latexo, have been subjected to and will continue to endure unconstitutional searches at the hands of defendants unless relief is granted at this time.

VII. *Conclusion.*

█ A preliminary injunction will issue. Defendants shall be enjoined from denying Scott Jones an opportunity to make up the three final examinations he did not take in May and from failing to make available instructional materials and other assistance to him in preparation for those examina-

---

**16.** The testimony indicated that without the nine–point reduction, Scott would have needed a score of "82" on his American History examination to pass the course. Due to the imposition of the nine–point penalty for Scott's three-day suspension, he needed a score of "127" on a 100 point test, a mathematical impossibility. Even with the penalty, he needed only a "42" and "52" on his other two final examinations,

Biology and English, to pass those courses. Thus, but for the nine–point penalty unlawfully imposed, Scott Jones had a strong probability of graduating high school with the Class of 1980. The fact that Scott, faced with the impossibility of graduating, declined to take any of the three examinations does not disqualify him from obtaining preliminary relief for the wrong he has suffered.

tions. Defendants shall also be enjoined from reducing Scott Jones' grades for the three days of school Scott missed during his suspension in April. If his test scores, when averaged in with his other grades from the 1979–1980 school year, exceed those necessary for passing all required courses under school regulations, the school officials will be enjoined to award a high school diploma to him.

Defendants shall further be enjoined from using "sniffer dogs" to search the person or property of plaintiffs Michele or Michael Jones in the absence of reasonable cause to believe that those particular individuals are in possession of contraband in violation of school rules.

An order will be entered in accordance with this memorandum opinion.