[Crim. No. 11498. Fourth Dist., Div. One. Sept. 18, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
CARY MITCHELL NAGDEMAN et al., Defendants and Appellants.

COUNSEL

David A. Rawson, Clyde S. Munsell and John A. Mitchell for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Bernard A. Delaney, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

THE COURT.*—

### KARMA'S DESTINY, ACT AND DEED[1]

Cary Mitchell Nagdeman and Shevawn Karol Barrette appeal their convictions based upon their pleas of guilty. Nagdeman pleaded guilty to possessing marijuana (Health & Saf. Code, § 11357, subd. (b)) and carrying a loaded firearm in public (Pen. Code, § 12031, subd. (a)). Barrette pleaded guilty to possessing marijuana for sale (Health & Saf. Code, § 11359). Both were granted probation conditioned, among other things, upon service of time in jail. Defendants contend the denial of their motions to suppress evidence (Pen. Code, § 1538.5) and to set aside the information (Pen. Code, § 995) was error for various reasons.

Officers of the Florida sheriff's office, while on airport duty in Fort Lauderdale, saw Nagdeman checking a seemingly heavy suitcase at the ticket counter. Nagdeman appeared nervous and was glancing from side to side. One of the officers thought he was too young to be carrying the expensive luggage he had.

---

*Before Brown (Gerald), P. J., Cologne, J., and Staniforth, J.
[1]See the dictionary for Karma.

While Nagdeman was boarding his airplane, the officers learned from the ticket agent Nagdeman was headed for San Diego, California, via Houston, Texas.

One of the officers lifted Nagdeman's suitcase which was sitting on the sidewalk. He estimated it weighed about 50 pounds. The bag had a claim check numbered 57-72-06 and two identification tags, one with Nagdeman's name on it. Both officers smelled a strong odor of marijuana coming from the suitcase.

The Florida officers called the Houston police, described Nagdeman, and suggested they investigate. The Houston officers saw Nagdeman talking to a blonde at the airport but did not have time to investigate further. Nagdeman and the blonde got on the airplane to San Diego together.

When the Florida officers learned no action had been taken in Houston, they called an agent of the drug enforcement agency in San Diego and related all the facts noted above.

San Diego officers went to the airport. They arranged for a trained customs dog, Karma, to be there. In a rear baggage area the officers found three similar suitcases from Nagdeman's flight and checked each one until they found one with the claim check number 57-72-06, and the two identification tags.

Karma was allowed to smell the bags on the luggage carriers. Bypassing the suitcase with Nagdeman's identification tag, Karma started scratching a suitcase with a different claim number and no identification tags. The three similar suitcases were moved to another area and Karma again alerted on the unidentified suitcase. The officers could smell an odor of marijuana coming from this bag themselves. This second bag weighed about 50 pounds. The bag with Nagdeman's identification weighed only 15-20 pounds. The officers suspected the tags had been switched. They then placed the bags on the luggage conveyor belt.

In the passenger area the officers saw Nagdeman talking with a blonde, later identified as defendant Barrette, and a man (Cohen). Nagdeman picked up the bag with his name tag. Barrette tried to lift one of the other similar bags but had to have either Nagdeman or Co-

hen remove it for her. The officers saw another man with a similar suitcase and, not being certain Barrette had the bag with the marijuana, had him detained separately.

The officers approached the three and asked them to come to a private office. An officer told them all of their constitutional rights and said they had been stopped for questioning about marijuana smuggling.

One officer asked Nagdeman for consent to look into his bag (the one with the identification tags). Nagdeman said, "Go ahead. You're going to anyway." The officer told him he did not have to give permission, but they could call and get a search warrant. After a short time, Nagdeman let the officers search the bag. They found a loaded pistol. Nagdeman was then patted down. A vial was found in his pants' pocket which contained cocaine paraphernalia and what appeared to be cocaine residue.

Barrette denied ownership of the other heavy suitcase, saying she must have picked it up by accident. One of the officers called the district attorney seeking a telephonic search warrant for this second suitcase. While he was calling, he searched Barrette's purse, sitting on the desk, for weapons and evidence. The officer found her airplane ticket which showed she had travelled by the same route as the second suitcase. The officer considered Barrette under arrest at that time, although he did not formally arrest her and Nagdeman until after he received the telephonic search warrant and discovered 49 pounds of bulk marijuana in the second suitcase. The defendants' carry-on luggage, although not covered by the warrant, was also searched.

During the inventory search of Nagdeman's suitcase with the identification tags a few days later, an officer discovered a small amount of marijuana and cocaine.

■ Defendants contend the facts known to the Florida officers (i.e., Nagdeman had expensive luggage for a young man, and he was looking around) did not justify a detention or search of Nagdeman or his luggage. Regardless of the merit of this assertion, no detention or search occurred in Florida. Nagdeman's person was in no way detained or delayed. He was apparently unaware he had aroused suspicion. Defendants contend the officers "searched" the suitcase when they smelled it. The officers did not open or otherwise intrude into the closed suitcase. They merely smelled an odor emanating from it while they were rightfully next to the suitcase. There was no search.

■ Defendants contend the "search" by Karma was an unlawful exploratory search since the San Diego officers only had information the suitcase with the identification tags contained marijuana, not the second suitcase identified by Karma. Barrette further argues a trained dog may corroborate probable cause by alerting but cannot provide probable cause without more.

Since the officers had an accurate description of the first bag and were using Karma to corroborate the tip from the Florida officers, they clearly were not conducting a general exploratory search of all the luggage, as was the situation in *People* v. *Williams* (1975) 51 Cal.App.3d 346 [124 Cal.Rptr. 253]). We have consistently held reliable trained dogs may be used to corroborate an informant's tip on the presence of narcotics in specific pieces of luggage (see *People* v. *Furman* (1973) 30 Cal.App.3d 454, 457 [106 Cal.Rptr. 366]; *People* v. *Lester* (1980) 101 Cal.App.3d 613, 615 [161 Cal.Rptr. 703]). Defendants do not contend Karma was not reliable.

Here the police could reasonably believe the tags had been switched and the bag alerted to was the same one seen by the Florida officers since it otherwise met the description they were given and was of the approximate weight. This was corroborated by Nagdeman's companion, Barrette, taking possession of the bag later. Defendants contend the only way the police could tie Barrette to the suitcase containing marijuana is through the theory the identification tags had been switched which, they argue, was physically impossible since the luggage had been in the exclusive control of airline personnel between Florida and San Diego. Although the officers did not know exactly how the switch took place, they could reasonably believe it had. We cannot say it was physically impossible. Therefore, Karma's alert, plus the information received from the Florida officers, provided probable cause to search the bag which the officers later did, as authorized by warrant.

■ Defendants contend their initial detention by the San Diego officers was unreasonable as based on insufficient reliable information. ■ An officer may detain someone briefly for investigation when he knows specific and articulable facts causing him to reasonably suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957]). ■ As for Nagdeman, the officers

had probable cause to believe the suitcase he had checked in Florida contained marijuana. Clearly he could be detained for questioning in the matter. Barrette was seen with Nagdeman, fit the description of the woman who met Nagdeman in Houston, and attempted to seize one of the suitcases similar to Nagdeman's. The bag was apparently too heavy for her to lift, which comports with it being the heavy suitcase the dog alerted to. She likewise could be properly detained for questioning. In fact, these circumstances were sufficient to provide the officers with probable cause to arrest the defendants for possessing marijuana (*People* v. *Lester, supra*, 101 Cal.App.3d 613).

Defendants contend even if their detentions were valid at their inception, they were unlawful in scope. The length of a detention may exceed constitutional bounds when it extends beyond what is reasonably necessary under the circumstances to accomplish its permissible purpose (*People* v. *McGaughran* (1979) 25 Cal.3d 577, 586 [159 Cal.Rptr. 191, 601 P.2d 207]). The officers, however, were allowed to complete their initial on-the-scene investigation (*People* v. *Gale* (1973) 9 Cal.3d 788, 798 [108 Cal.Rptr. 852, 511 P.2d 1204]) and they moved with dispatch to obtain the telephonic search warrant. They never questioned the defendants on areas unrelated to the marijuana they reasonably believed was in the second case. The length of the detention was reasonable in allowing the officers time to obtain a search warrant.

■ Our holding the detention was lawful answers in the negative the defendants' claim Nagdeman's consent to search his case was incident to an unlawful detention. Moreover, Nagdeman was told he was not required to give consent, yet he let the officers search his bag. The officer telling him a search warrant could be sought does not necessarily vitiate his consent (see *People* v. *Ruster* (1976) 16 Cal.3d 690, 701 [129 Cal.Rptr. 153, 548 P.2d 353, 80 A.L.R.3d 1269]). The question of voluntariness is one of fact to be determined in the light of all the circumstances (*People* v. *Reyes* (1974) 12 Cal.3d 486, 501 [116 Cal.Rptr. 217, 526 P.2d 225]). The record amply supports a finding of a voluntarily given consent. Since the search was supported by Nagdeman's consent, we need not address defendants' contentions the search is not supportable as being incident to arrest or incident to the temporary detention.

■ Barrette contends the search of her purse was unlawful since the officers did not have probable cause to arrest her at the time of the

search and could not justify the search as incident to that arrest. In the alternative, she contends if the officers did have probable cause, they could not legally search the purse without a search warrant once it was within their exclusive control. The People seek to support the search as one incident to arrest or as an "accelerated booking search."

As we have already noted, the officers had probable cause to arrest the defendants before the search of the purse occurred. Once the officers had probable cause to arrest the defendants and intended to jail them, they could conduct an "accelerated booking search" (see *People* v. *Barajas* (1978) 81 Cal.App.3d 999, 1008 [147 Cal.Rptr. 195]) of Barrette's personal property (*People* v. *Gilliam* (1974) 41 Cal.App.3d 181, 189 [116 Cal.Rptr. 317]; Pen. Code; § 1412). The search of the purse was lawful.

Defendants also contend the search of Nagdeman's pockets, the defendants' carry-on luggage and later inventory search of Nagdeman's suitcase were unlawful. However, no evidence obtained by these searches was involved in the charges of which the defendants were convicted (see *People* v. *Punchard* (1980) 103 Cal.App.3d 995, 998-1000 [163 Cal.Rptr. 366]). There is nothing to suppress.

Judgments affirmed.

A petition for a rehearing was denied October 15, 1980, and appellants' petitions for a hearing by the Supreme Court were denied November 12, 1980.