[Crim. No. 35251. Second Dist., Div. Five. Dec. 5, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
SARAH MINDA DENMAN, Defendant and Appellant.

1004

COUNSEL

Nasatir, Sherman & Hirsch and Richard G. Hirsch for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Donald E. DeNicola, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STEPHENS, J.**—Appellant was charged by information with possession of marijuana for sale, a violation of Health and Safety Code section 11359. Appellant entered a plea of guilty after the court denied her pretrial motions pursuant to Penal Code sections 995 and 1538.5. The court placed appellant on probation for a period of three years on the condition, inter alia, that she spend one year in the county jail. Appellant appeals from the judgment.

The facts may be summarized as follows: appellant entered Miami International Airport on May 30, 1978. She was observed by two police officers of the Dade County Public Safety Department, Deputy Joan Wolfe and Deputy D'Azevedo. Appellant carried six pieces of luggage and appeared to be nervous. Deputy Wolfe stepped into the check-in line behind appellant and, as appellant addressed the airline agent, Deputy Wolfe stepped up beside her and leaned against the ticket counter to better hear and observe the exchange. Appellant filled out baggage tickets; three of her six pieces were labeled with the name "Hartman" and the remaining three bags were labeled with identification tags bearing the name "Stewart." Appellant handed the agent two tickets, one in the name of Stewart and one in the name of Hartman; she explained that she was travelling with a friend. Identifying herself as "M. Stewart," appellant indicated that her own bags were going to San Diego via Los Angeles and that the Hartman luggage was destined for Los Angeles. The ticket agent handed appellant two boarding passes, and Deputy Wolfe followed appellant to the boarding area.

After appellant passed through the security counter, Deputy Wolfe approached her. Walking beside appellant, Deputy Wolfe identified herself as a police officer and asked whether appellant would mind answering a few questions. Appellant acquiesced, but informed the deputy that she did not want to miss her flight, which was due to depart within a few minutes. In order that she not delay appellant, Deputy Wolfe continued to walk along with her as she hurried to catch her flight.

During their conversation, appellant disclosed that she carried no identification; Deputy Wolfe briefly examined appellant's airline ticket and three baggage claim stubs and noted the numbers on the ticket stubs of the baggage destined for San Diego. After an interchange concerning the number of bags appellant possessed, and a repeated request for identification, appellant indicated that she did not wish to answer any additional questions, and said that she had to leave to catch her flight. The entire conversation lasted approximately two minutes.

After watching appellant board the aircraft (still in possession of both boarding passes), Deputy Wolfe returned to the ticket counter. Employing the airlines computer, she learned that appellant's tickets had been purchased earlier in the day at a local travel agency. The deputy phoned the travel agency and discovered that a woman fitting appellant's description had paid cash for two tickets, one in the name of "Stewart" and the other in the name of "Hartman." The woman had identified herself as "M. Stewart" and had given the agency a telephone number at which she said she could be contacted. Deputy Wolfe dialed the number and spoke with a woman who stated that she knew no one by the name of "Stewart."

At this point Deputies Wolfe and D'Azevedo telephoned Los Angeles Police Officer Michael Farrant, with whom they had a working relationship, and disclosed to him the particulars of their investigation of appellant at the airport. The deputies relayed to Officer Farrant a detailed description of appellant, her luggage, and the baggage stub numbers on the luggage bound for San Diego.

Officer Farrant and Officer Celmer met appellant's flight at the airport in Los Angeles; they observed appellant disembark and meet one Candice Keanaaina. Keanaaina received some baggage claim checks from appellant and proceeded to the baggage claim area; Officer Celmer continued his surveillance. Appellant went to the airport bar, where she remained until her arrest.

Simultaneously, in the area where the luggage from appellant's flight was being unloaded from the aircraft, United States Customs Agent Daniel Niederberger brought "Blackie," a dog trained to detect narcotics through its sense of smell, to an area containing 16 items of luggage. Six of the items were those checked by appellant; ten were chosen at random for purposes of the inspection. "Blackie," trained to scratch and bite in the presence of narcotics, "alerted" to appellant's six pieces of

luggage. The Los Angeles bound bags, tagged with the name "Hart-man," were then sent to the baggage claim area where they were claimed by Keanaaina. Officer Celmer, in the baggage claim area, was notified by radio that "Blackie" had responded to the bags in question; he was also apprised of their respective claim check numbers.

Officer Celmer followed Keanaaina (and the three Hartman bags) to a taxicab outside the terminal. Keanaaina agreed to speak with the officer, and identified the baggage as her own. Keanaaina also indicated that her name was "Martha Rich." Officer Celmer, having informed Keanaaina that he was conducting a narcotics investigation at the outset of their conversation, now expressed his belief that Keanaaina was "possibly" in possession of narcotics, and asked for permission to search the bags. Keanaaina responded, "Yes, go ahead."[1] The bags contained between 50 and 80 pounds of marijuana; Officer Celmer placed Keanaaina under arrest. He then radioed Officer Farrant, who had already learned of "Blackie's" response to appellant's luggage, and told him of the discovery of the marijuana. Farrant thereupon arrested appellant at the airport bar, and escorted her to the narcotics office, where Keanaaina and all six pieces of luggage were located.[2] After being advised of her constitutional rights, appellant agreed to talk with Officer Celmer, and gave her permission that her luggage be searched. Appellant gave Officer Farrant permission to remove the keys to the luggage from her purse; although appellant denied that her luggage contained narcotics, the search disclosed marijuana. The total amount of marijuana in the 6 pieces of luggage weighed approximately 272 pounds.

Appellant contends on appeal that: (1) the initial contact between Deputy Wolfe and appellant constitutes a detention unjustified by reasonable cause to believe appellant was engaged in criminal activity, and therefore is an illegal detention; (2) the canine search was not support-ed by probable cause and was therefore unlawful; (3) even assuming the legality of the detention and the canine search, the subsequent warrantless search of appellant's luggage was illegal because the consents were

---

[1] Keanaaina's responses were consistent with her subsequent claims that she did not know the contents of the luggage she was attempting to transport; given this stance, her consent to the search is not anomalous.

[2] Upon appellant's arrival at the narcotics office, she observed the three bags corresponding to the claim tickets which she had given to Keanaaina. They had apparently been opened: each was "half shut," and appellant observed the marijuana inside.

coerced; and (4) even if the consents were *not* coerced, the trial court's failure to make a specific finding on this issue requires that the case be remanded.[3]

With regard to appellant's first contention, appellant cites *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957] for the proposition that the determinative element in considering the legality of a detention is "the purpose of the intrusion itself. If the individual is stopped or detained because the officer suspects he may be personally involved in some criminal activity, his Fourth Amendment rights are implicated and he is entitled to the safeguards of the rules set forth above." (*Id.* at p. 895.)

We point out here, as in *People v. Jones* (1979) 96 Cal.App.3d 820, 825 [158 Cal.Rptr. 415], that the foregoing rule is predicated on the assumption that an individual is "stopped or detained." The issue here, as in *Jones,* is not whether Deputy Wolfe suspected appellant of criminal activity, but whether in the first instance the deputy's conversation with appellant constituted a stop or detention under *Tony C.* We have determined that it did not.

■ A police officer, in the performance of his duties, may address another person as long as there is no temporary restraint or holding in custody. (*People v. Jones, supra,* 96 Cal.App.3d 820, 825.) ■ On the facts before us, it is clear that the brief conversation between Deputy Wolfe and appellant did not rise to the level of detention; that no restraint was involved is most clearly illustrated by the fact that the contact was terminated by appellant. The record is consistent in its indication that after a conversation of two minutes or so, appellant said that she no longer wished to converse with Deputy Wolfe, and proceeded to board her flight. Obviously, neither the deputy nor the appellant believed that appellant was being detained.[4]

---

[3]Appellant's contention that the police tactics employed in the instant case constitute a threat to the constitutional right to travel of all citizens and therefore require reversal is specious. We reject it.

[4]Such visible belief on the part of appellant that she was free of restraint also circumvents any issue of detention under Florida state law, which focuses on the state of mind of the party approached. (*State v. Frost* (Fla.App. 1979) 374 So.2d 593, 597.)

*Brown v. Texas* (1979) 443 U.S. 47 [61 L.Ed.2d 357, 99 S.Ct. 2637] does not establish a different rule. There the defendant was actually stopped and identification required. Here there was no stopping and the individual consented to answer the questions so long as she did not miss her flight. Further, she terminated the discussion when

■ Given this resolution to the issue of detention, the fruits of the canine search need not be suppressed due to any antecedent illegality in police procedure. Cause to conduct the canine search is amply supplied by the record: police officers may be reliable informants as to their own observations made in the course of their duties. (*People v. Ruster* (1976) 16 Cal.3d 690, 702 [129 Cal.Rptr. 153, 548 P.2d 353, 80 A.L.R.3d 1269].) Furthermore, such cause was established by the facts related to the Los Angeles police by their Miami counterparts: appellant's retention of two boarding passes as she cleared the security counter was inconsistent with the assumption that her "companion" merely missed the flight, inasmuch as appellant neither waited nor looked for her companion, nor did she attempt to have said party paged. In addition, Los Angeles police were apprised of the fact that the "call-back" number left by appellant with the travel agency was apparently false. These facts, in conjunction with appellant's nervousness, inability to produce identification, and excessive amount of luggage clearly justified the canine inspection of the luggage.

Finally, appellant's contentions regarding the consents given by appellant and Ms. Keanaaina to the search of the luggage are in clear conflict with established precedent. Contrary to appellant's assertions, *People v. James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135] enunciates, inter alia, the following principles: the question of the voluntariness of consent is to be determined in the first instance by the trier of fact; the evaluation of witnesses' credibility and resolution of conflicts in testimony is vested in the trial court. "On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence." (*People v. James, supra*, 19 Cal.3d 99, 107, quoting *People v. Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].) The record indicates that the trial court favored the credibility of the witnesses for the prosecution. ■ In this instance, Officer Celmer testified that he requested and obtained Ms. Keanaaina's permission to search the luggage in her possession, and that he similarly obtained appellant's consent to search her luggage.

■ Also made clear in *James* is that consent to a search is not rendered involuntary as a matter of law because it is given while a par-

---

she wished to. We know of no cases wherein it has been held that an officer may not seek an interview, and, where consent therefor is given, that the defendant was held to have been *illegally detained*.

ty is in custody (19 Cal.3d at pp. 109, 110), and, furthermore, that a party need not be explicitly advised of his ability to refuse to give consent to a search (*id.* at pp. 115, 116). In addition, *James* explicitly states that a consent is not rendered involuntary by virtue of the fact that a party is not advised of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] prior to giving consent to a search. (19 Cal.3d at pp. 114, 115.)

■ Appellant, apparently not content to simply ignore *People* v. *James, supra*, utilizes her last contention in an attempt to sidestep it with an appellate decision, *People* v. *Farley* (1979) 90 Cal.App.3d 851 [153 Cal.Rptr. 695]. She cites this case for the proposition that a trial court's failure to make a specific finding on the consent issue requires reversal for determination of this issue. Suffice it to say that *Farley* concerns a defendant's assertion that he was denied effective assistance of counsel by virtue of the fact that a consent issue *was not raised* by that defendant's attorney, thereby indicating that the trier of fact *could not* have, even "impliedly," determined that issue. In the case at bar, the consent issue was strenuously argued by appellant's counsel. *James'* admonition regarding the trial court's preeminent role in evaluating credibility, weighing evidence, and resolving conflicts in testimony remains the law in California, and is clearly applicable in this instance.

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.