[Crim. No. 22038. May 13, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH PATRICK MAYBERRY, Defendant and Appellant.

COUNSEL

Charles T. Bumer, Patrick F. O'Connor and Walter Maund for Defendant and Appellant.

Thomas W. Corn, Stephen J. Heiser, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz and Fred Okrand as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield, Richard D. Garske and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**RICHARDSON, J.**—(1a) May law enforcement officers use police-trained dogs to detect the odor of narcotics emanating from transported containers in the baggage areas of public airports? Under the circumstances herein presented we conclude that they may and that the limited and nonintrusive olfactory investigation performed in this case did not constitute a "search" thereby invoking the constitutional limitations imposed by the Fourth Amendment to the United States Constitution or article I, section 13, of the California Constitution. Accordingly, we will affirm defendant's judgment of conviction.

An amended information filed in the San Diego Superior Court December 12, 1979, charged defendant with: (1) transporting marijuana (Health & Saf. Code, § 11360, subd. (a)); (2) possessing marijuana for sale (*id.*, § 11359); and (3) possessing concentrated cannabis (*id.*, § 11357, subd. (a)).

Following the denial of defendant's motion to suppress under Penal Code section 1538.5, he entered a plea of guilty to the charge of transporting marijuana. He was given a 3-year suspended sentence with 60

days' confinement, and required to register pursuant to Health and Safety Code section 11590 and to submit to other conditions of probation. Defendant appeals from the denial of the section 1538.5 motion to suppress.

On August 8, 1979, Officers Cooper and Flores of the San Diego Police Department's Narcotics Task Force (NTF) were on duty in the nonpublic portion of the baggage area at the San Diego Airport. With full permission of the airport authority and the airlines, Officer Cooper, assisted by a fully trained and qualified narcotics dog, "Corky," was checking, for evidence of narcotics, all luggage from certain inbound aircraft flights originating in Florida. Defendant, flying to San Diego from Dayton, Ohio, at the Dallas-Fort Worth Airport had boarded a flight originating in Miami. The officers had no previous information that defendant's luggage contained any contraband, nor was there any other reason to be suspicious of his luggage.

After Corky "alerted" to defendant's suitcase, an identifying tape was placed on it and it was transported to the baggage claim area with the rest of the luggage from the flight. When defendant picked up the suitcase, Officer Cooper identified himself and requested that defendant accompany him to an airport office for an investigation. Defendant agreed, and after having been informed of Corky's "alert," was asked to consent to a search of his luggage. Defendant orally agreed, but before he signed a written consent form Officer Cooper told him that the officer had never failed to get a warrant under similar circumstances. Defendant was advised of his *Miranda* rights; the suitcase was opened and found to contain marijuana.

The trial court made the following findings:

1. On the day in question, law enforcement officers and Corky were allowed to be anywhere at the airport including the baggage handling areas.

2. Both Corky and his handler, Officer Cooper, were fully trained in narcotics detection.

3. Based on information as to the flow of narcotics from Florida to San Diego, the agents had reason to believe narcotics could be found in the luggage of incoming passengers from planes originating in Florida.

4. Law enforcement officers did not have specific information regarding defendant.

5. The sniffing of the luggage by Corky in the baggage area, and away from public view, was a minimal intrusion justified by the agents' reasonable efforts to protect the public from the flow of narcotics from Florida.

6. The use of Corky to alert the agents to the suitcase was reasonable.

7. Defendant voluntarily consented to a search of his suitcase after being contacted by law enforcement.

8. The motion to suppress should be denied.

To the extent these findings resolve questions of fact, they must be upheld on appeal if supported by substantial evidence; yet we exercise our independent judgment in reviewing the legal question whether the officer's conduct was reasonable under the Constitution. (See *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].)

The NTF justifies its search of all luggage off incoming flights originating in Florida on its experience with a "high" frequency of narcotics seizures in luggage from such flights. During 1979, 25 narcotics cases involved incoming flights to San Diego. Of those 25 cases, 14, or 56 percent, were from flights originating in Florida. During the same period there were 5 flights a day from Florida to San Diego, or a total of 1,825 flights. Accordingly, less than 1 percent of these (approximately .76 percent) flights were found to have narcotics aboard. The record also demonstrates that the NTF has established excellent contacts in Florida, both among law enforcement officers and informants.

Defendant contends that Corky's smelling of his luggage constituted an unreasonable exploratory search. His claim is supported by several California appellate cases which have invalidated similar canine procedures unless preceded by prior information or a reasonable suspicion that narcotics may be present in the subject area. (See *People* v. *Denman* (1980) 112 Cal.App.3d 1003, 1005-1007 [169 Cal.Rptr. 742]; *People* v. *Nagdeman* (1980) 110 Cal.App.3d 404, 410 [168 Cal.Rptr. 16]; *People* v. *Lester* (1980) 101 Cal.App.3d 613, 615 [161 Cal.Rptr.

703]; *People* v. *Evans* (1977) 65 Cal.App.3d 924, 933-936 [134 Cal. Rptr. 436]; *People* v. *Williams* (1975) 51 Cal.App.3d 346, 350 [123 Cal.Rptr. 891]; *People* v. *Furman* (1973) 30 Cal.App.3d 454, 457 [106 Cal.Rptr. 366].) Defendant argues that, standing alone, statistics disclosing a high relative frequency of drug traffic from Florida afford an insufficient basis for subjecting his luggage to an exploratory warrantless sniff.

All of the foregoing cases are premised upon the proposition that similar canine olfactory investigations constituted a "search," the propriety of which would be governed by Fourth Amendment principles. A recent appellate case, however, *People* v. *Matthews* (1980) 112 Cal. App.3d 11, 19-20 [169 Cal.Rptr. 263], noting a series of recent contrary federal decisions, has cast doubt upon this conclusion. In upholding a warrantless sniff of narcotics at a Long Beach storage terminal, the *Matthews* court observed, "The use of narcotic trained detector dogs is not uncommon, and federal courts have . . . held that sniffing the air surrounding an object *is neither an intrusion nor a search*." (P. 19, italics added.) There is substantial authority supporting this conclusion. (*United States* v. *Goldstein* (5th Cir. 1981) 635 F.2d 356, 360 [airport]; *United States* v. *Klein* (7th Cir. 1980) 626 F.2d 22, 26 [same]; *United States* v. *Sullivan* (4th Cir. 1980) 625 F.2d 9, 13 [same]; *United States* v. *Venema* (10th Cir. 1977) 563 F.2d 1003, 1006 [storage locker]; *United States* v. *Race* (1st Cir. 1976) 529 F.2d 12, 14, fn. 2 [airline warehouse]; *United States* v. *Bronstein* (2d Cir. 1975) 521 F.2d 459, 463 [airport]; *United States* v. *Fulero* (D.C. Cir. 1974) 498 F.2d 748, 749 [bus terminal]; see also *Doe* v. *Renfrow* (7th Cir. 1980) 631 F.2d 91, rehg. den. (1980) 635 F.2d 582, cert. den. 451 U.S. 1022 [69 L.Ed.2d 395, 101 S.Ct. 3015] [high school]; *United States* v. *Solis* (9th Cir. 1976) 536 F.2d 880, 882 [semitrailer]; Annot. (1977) 31 A.L.R. Fed. 931; Comment (1976) 13 San Diego L.Rev. 410; Note (1976) 44 Fordham L.Rev. 973.)

We recognize that one recent federal case has departed from the foregoing line of authorities and has held that the use of trained police dogs to sniff luggage is a search for Fourth Amendment purposes. (*United States* v. *Beale* (9th Cir. 1982) 674 F.2d 1327.) No petition for certiorari has yet been filed in *Beale,* and, with due respect, we disagree with its conclusion. *Beale* stressed the sanctity of private luggage, and opined that "One who reposes his personal effects, *including contraband,* in a locked suitcase is surely entitled to assume that a trained canine will not broadcast its incriminating contents to the authorities."

(P. 1334, italics added.) To the contrary, one who secretes illegal narcotics in his suitcase has no *protectable* privacy interest in those narcotics, nor any legitimate objection to an unintrusive method of detection which reacts *only* to such contraband. As *Beale* itself acknowledges, detection of narcotics by trained sniffer dogs is a "minimal invasion of privacy," involving "no risk that an innocent person's privacy will be intruded upon." (P. 1334, quoting from earlier authorities.)

■ It is commonly accepted that a "search" is a governmental intrusion upon, or invasion of, a citizen's personal security in an area in which he has a reasonable expectation of privacy. (See *Terry* v. *Ohio* (1968) 392 U.S. 1, 9, 16-19, and fn. 15 [20 L.Ed.2d 889, 898, 902-905, 88 S.Ct. 1868]; *People* v. *Hyde* (1974) 12 Cal.3d 158, 164 [115 Cal. Rptr. 358, 524 P.2d 830]; *People* v. *Edwards* (1969) 71 Cal.2d 1096, 1100-1104 [80 Cal.Rptr. 633, 458 P.2d 713].) Most of the foregoing federal cases have concluded that dog-sniffing investigations of the type here employed are neither intrusions nor invasions of anyone's reasonable expectation of privacy. The courts so holding have stressed that such procedures involve no physical entry into one's home or possessions, or invasion of one's person, or use of mechanical or electronic equipment, or examination of, or prying into, one's private communications or noncriminal personal affairs. Additionally, as the Second Circuit Court of Appeals stressed in *Bronstein, supra*, police dogs are trained to "alert" or react *only to contraband*, unlike mechanical investigatory aids or devices (magnetometers, telescopes, recorders, etc.) which intrude in sweeping and *indiscriminate* fashion into one's private affairs and personal effects. (521 F.2d at p. 463; see *Hyde, supra*, at p. 164.)

■ Did Corky breach any reasonable, protectable expectation of privacy as to any odors emanating from defendant's concealed contraband? We think not. Rather, we share the views recently expressed by the Fifth Circuit Court of Appeals in *Goldstein, supra*. In rejecting such expectation, it held that although an airline passenger may reasonably anticipate that the *contents* of his luggage will not be exposed in the absence of consent or a search warrant, "the passenger's reasonable expectation of privacy does not extend to the airspace surrounding that luggage." (635 F.2d at p. 361; accord *United States* v. *Sullivan, supra*, 625 F.2d 9, 13, stressing that narcotic-trained dogs are used "in response to the need to control the rise in illegal drug trafficking, while

preserving, at the same time, an airline passenger's reasonable expectation of privacy.")

In our view, the escaping smell of contraband from luggage may be likened to the emanation of a fluid leaking from a container. The odor is detectable by the nose, as the leak is visible to the eye. We discern no constitutionally significant difference in the manner of escape, and conclude that any privacy right is lost when either escapes into the surrounding area. Given Corky's training, our conclusion is not altered by the fact that it is his nose and not his handler's which detected the odor.

From the foregoing, we conclude that, at least within the context of an airport luggage search, passengers (and others transporting narcotics) have no reasonable expectation of privacy which would preclude the use of sniffer dogs such as Corky even when there is an absence of prior specific suspicion that narcotics are present.

We add two cautionary notes. Prior appellate cases quite properly have required an adequate demonstration of the dog's training and experience in narcotics detection before the dog's reaction to a particular suitcase or other object is admitted into evidence. (E.g., *People v. Evans, supra*, 65 Cal.App.3d 924, 933; *People v. Furman, supra*, 30 Cal.App.3d 454, 457.) Such condition was met in the present case, as reflected in the trial court's findings, and defendant does not challenge this.

Moreover, as the People readily acknowledge, a police dog's positive reaction to a suitcase ordinarily is not sufficient cause to search and seize it without a warrant. In the absence of either *exigent circumstances or consent* by the owner, the investigating officers must first obtain a search warrant upon a proper showing of probable cause. (See *People v. Denman, supra*, 112 Cal.App.3d 1003, 1010-1011 [consent]; *People v. Lester, supra*, 101 Cal.App.3d 613, 615 [search warrant]; cf. *United States v. Goldstein, supra*, 635 F.2d 356, 361; *United States v. Sullivan, supra*, 625 F.2d 9, 13.)

The trial court found that defendant had consented to a search of his luggage after Corky "alerted" to the presence of narcotics therein. Although defendant maintains that his consent was involuntary, being a "mere submission to authority," this was a factual matter which the tri-

al court, in light of all the circumstances, resolved adversely to defendant. (*People v. James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447]; *People v. Reyes* (1974) 12 Cal.3d 486, 501 [116 Cal.Rptr. 217, 526 P.2d 225]; *People v. Denman, supra*, 112 Cal.App.3d 1003, 1010-1011.) Nor, in our view, was the defendant's consent to the search nullified by the officer's comment to defendant that a search warrant could readily be obtained. (*People v. Ruster* (1976) 16 Cal.3d 690, 701 [129 Cal.Rptr. 153, 548 P.2d 353, 80 A.L.R.3d 1269]; *People v. Nagdeman, supra*, 110 Cal.App.3d 404, 411.) Rather, our review of the record discloses substantial evidence supporting the trial court's finding of consent.

The judgment is affirmed.

Mosk, J., Newman, J., Kaus, J., and Broussard, J., concurred.

**BIRD, C. J.,** Dissenting.—A rose by any other name would *not* make this a "plain smell" case. The odor which the dog Corky perceived was *not* "detectable by the nose" of any police officer. (See maj. opn., *ante*, at p. 342.) In holding that no search occurs when the government uses specially trained animals to detect that which is undetectable to human senses, the majority casts its lot with a number of courts, mostly federal, whose decisions on this issue have been justly criticized as "short on reasoning" and "unsound." (1 LaFave, Search and Seizure (1978) p. 283.)

It is neither wise nor necessary for this court to join this "unfortunate tendency." (*Id.*, at p. 286.) Unwise, because the "[t]otally unrestrained use of trained dogs ... would not be consistent with the kind of open society to which we are committed. It would be intolerable if the police, in no way limited by the Fourth Amendment, were free to utilize dogs to undertake 'a wholesale examination of all baggage in the hope that a crime might be detected' or 'to roam the streets at will with trained dogs or sensor instruments, detecting the odor of marijuana and arresting persons at will as a result.'" (*Ibid.*, fns. omitted.)

Nor is today's holding justified by logic or precedent. The majority's conclusion has been rejected by virtually all of the commentators na-

tionwide[1] and is a sharp, unexplained break with a consistent line of decisions by the courts of appeal of this state.[2]

I must respectfully dissent.

## I.

In order to appreciate the significance of the issues in this case, it is necessary to begin with a basic observation. The California Constitution prohibits "unreasonable seizures and searches" (art. I, § 13), and the Fourth Amendment to the federal Constitution contains a similar proscription. Thus, the present appeal and virtually all "search" cases pose two general issues for potential resolution. First, it must be determined whether a "seizure" or "search" occurred within the meaning of the California and/or federal Constitutions.[3] If it is found that a search (or seizure) did occur, the second issue is whether that activity was "unreasonable."[4] (See *Jones* v. *Latexo Independent School Dist.* (E.D.Tex. 1980) 499 F.Supp. 223, 231.)

---

[1]With considerable surprise, I find the majority opinion citing to two law review articles as "authority supporting th[e] conclusion" that "'[t]he use of narcotic trained detector dogs ... is neither an intrusion nor a search.'" (*Ante*, at p. 340, italics deleted.) Actually, both articles conclude quite the opposite.
 The first article cited argues that "[i]n most situations, the use of a drug detection dog should be [considered] a search." (Comment (1976) 13 San Diego L.Rev. 410, 426.) The comment criticizes contrary federal authority because it "tortures" the constitutional theory which it purports to apply. (*Id.*, at p. 427.)
 Similarly, the second article concludes that the "preferable" decisions are those which find the use of dogs to detect hidden objects to be searches. (Note. (1976) 44 Fordham L.Rev. 973, 989.) It criticizes federal authority to the contrary as "a drastic erosion of an individual's right to privacy." (*Id.*, at p. 990.)

[2]The majority opinion notes the existence of these decisions in passing (*ante*, at pp. 339-340) but does not deal with them thereafter.

[3]Henceforth in this opinion, as is the frequent practice in this court, the term "Fourth Amendment" is used as a convenient shorthand reference to the search and seizure provisions of both Constitutions, unless the context indicates otherwise. Since these provisions are "amplified by the specific right of privacy guaranteed by article I, section 1, of the California Constitution" (see *People* v. *Arno* (1979) 90 Cal.App.3d 505, 511 [153 Cal.Rptr. 624]), my use of "Fourth Amendment" includes reference to article I, section 1.

[4]It is readily apparent that the constitutional provisions regarding unreasonable seizures and searches are "stated in general terms which are not self-defining." (See 1 LaFave, *supra*, at p. v.) The burden has fallen to the courts to give "concrete and contemporary meaning to that brief, vague, general, unilluminating text ...." (Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn. L.Rev. 349, 353-354.) The courts have striven to accomplish this by setting forth specific rules, such as the rule that a search is "unreasonable" unless authorized by a warrant or one of the exceptions to the warrant requirement.

The considerations underlying a proper analysis of these two questions are quite distinct. If, for example, a given police action is upheld against a Fourth Amendment challenge, it can matter a great deal as to which of the two questions—was there a "search"? or was the search "unreasonable"?—is given the negative answer. This is so because the words "seizures and searches" in the constitutional provisions are "terms of limitation. Law enforcement practices are not required by the fourth amendment to be reasonable unless they are either 'searches' or 'seizures.'" (Amsterdam, *Perspectives on the Fourth Amendment, supra,* 58 Minn.L.Rev. 349, 356.) Police actions not amounting to searches or seizures may, with only limited exceptions,[5] be as unreasonable, arbitrary, or groundless as the officers please to make them. (See *id.,* at p. 388; 1 LaFave, *supra,* at pp. 235, 269.)

Thus, this court needs to exercise particular caution in deciding which police actions are not searches or seizures. Resolution of such questions "should be viewed with an appreciation that to exclude any particular police activity from coverage is essentially to exclude it from judicial control and from the command of reasonableness, whereas to include it is to do no more than say it must be conducted in a reasonable manner." (Amsterdam, *supra,* 58 Minn.L.Rev. at p. 393, fn. omitted.) "[T]he push must be in the direction of applying the 'search' appellation to those varieties of police conduct which we are not prepared to leave totally uncontrolled." (1 LaFave, *supra,* at p. 269.)

By its judgment and reasoning in this case, a majority of this court is apparently "prepared to leave totally uncontrolled" the government's use of trained detector dogs. I use the word "apparently" because nowhere in its opinion is there reflected any appreciation that this is a necessary consequence of its holding.

This shortsightedness might seem, at first glance, to be shared by the cases cited in the majority opinion as holding that police use of detector dogs is not a search. Closer inspection reveals that this is not necessarily so. While the cases do perhaps state that this particular police activity does not amount to a search, the underlying reasoning is generally tied to the reasonableness of the activity and the existence of specific cause to suspect the presence of contraband.[6] (See 1 LaFave, *supra,* at

---

[5] I recognize, of course, that other constitutional guarantees place checks upon police activities to some extent. However, as one commentator has noted, "notwithstanding all of them, an enormous range of police power stands unrestrained and subject to abuse." (*Id.,* at p. 378.)

[6] The primary exceptions are two "border search" cases, where the normal rules regarding the reasonableness of a search do not apply. (*People v. Matthews* (1980) 112

p. 288.) Of course, there is no Fourth Amendment command that police activity be reasonable or justified by good cause unless it amounts to a "search."

Therefore, it requires a blind leap of faith for the majority to jump from these cases to the conclusion that the same results would have been reached if, as in the present appeal, there were no "particularized cause" or "reasonable suspicion" to justify the police activity. Indeed, the Ninth Circuit Court of Appeals authored one of the cases which the majority believes supports today's result (*United States* v. *Solis* (9th Cir. 1976) 536 F.2d 880), and yet in a recent decision, that circuit explicitly rejects the majority's conclusion. (*United States* v. *Beale* (1982) 674 F.2d 1327.) The decisions in the remaining circuits, too, contain language strongly suggesting they are *not* controlling in the present context. (See, e.g., *United States* v. *Klein* (7th Cir. 1980) 626 F.2d 22, 27 ["This is not a case in which we need confront the thorny problem of an indiscriminate, dragnet-type sniffing expedition."]; *United States* v. *Bronstein* (2d Cir. 1975) 521 F.2d 459, 463, cert. den. 424 U.S. 918 [47 L.Ed.2d 324, 96 S.Ct. 1121] [The police dog "was not employed in a dragnet operation directed against all flight passengers but rather on the basis of reliable information that reasonably triggered the surveillance employed here."].)

## II.

What, then, is a "search"? At one time it was considered that a search was a physical intrusion or trespass by government agents into a constitutionally protected area. However, with the Supreme Court's landmark decision in *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], that view of the scope of the Fourth Amendment has been considerably expanded.

---

Cal.App.3d 11 [169 Cal.Rptr. 263]; *United States* v. *Race* (1st Cir. 1976) 529 F.2d 12. See also *Arkansas* v. *Sanders* (1979) 442 U.S. 753, 764, fn. 12 [61 L.Ed.2d 235, 245, 99 S.Ct. 2586].) Thus, the *Matthews* court premised its holding upon the belief that "not even [a] suspicion" of criminality was required to justify use of a detector dog "in a 'border area' at a port of entry by a customs official in a place under the control of customs ...." (112 Cal.App.3d at p. 21.)

In a third case, a court found that under the facts presented, the police's use of a dog "would probably meet the reasonable suspicion standard," but it based its decision on "no search" grounds. (*United States* v. *Goldstein* (5th Cir. 1981) 635 F.2d 356, 362, fn. 10, rehg. den. 640 F.2d 385, cert. den. 452 U.S. 962 [69 L.Ed.2d 972, 101 S.Ct. 3111].) The reasoning upon which it premised this holding will be discussed in the next section of this opinion.

In *Katz*, an FBI investigation had "established a strong probability" that Katz was using a certain public telephone to transmit gambling information in violation of federal law. (*Id.*, at p. 354 [19 L.Ed.2d at p. 583].) FBI agents attached an electronic listening and recording device to the outside of the telephone booth, and they thereby listened to and recorded Katz' end of phone calls he made from the booth. The booth itself "was constructed partly of glass, so that [Katz] was as visible after he entered it as he would have been if he had remained outside." (*Id.*, at p. 352 [19 L.Ed.2d at p. 582].) There was no indication that the booth was soundproof. The government used the conversation thus obtained to convict Katz of federal crimes.

On appeal, the parties framed the issues in traditional terms: Was the telephone booth a constitutionally protected area? Was physical penetration required to invoke the Fourth Amendment? The court, however, "decline[d] to adopt this formulation of the issues." (*Id.*, at p. 350 [19 L.Ed.2d at p. 581].) Rejecting the theory that the Fourth Amendment applied only to "constitutionally protected areas," the *Katz* court declared, "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." (*Id.*, at pp. 351-352 [19 L.Ed.2d at p. 582], citations omitted; see also *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 637 [108 Cal.Rptr. 585, 511 P.2d 33].)

The court further ruled that "no constitutional significance" was attributable to the fact that the electronic device used against *Katz* "did not happen to penetrate the wall of the booth." (389 U.S. at p. 353 [19 L.Ed.2d at p. 583].) "[T]he reach of [the Fourth] Amendment," it held, "cannot turn upon the presence or absence of a physical intrusion into any given enclosure." (*Ibid.*) Instead, the FBI's activities amounted to a search—or, more accurately, triggered scrutiny under the Fourth Amendment—simply because those activities "violated the privacy upon which [Katz] justifiably relied while using the telephone booth." (*Ibid.*)

Thus, under *Katz*, the determination of whether or not the Fourth Amendment applies to a particular governmental activity depends very little upon the type of activity itself. The nature of the activity may be relevant to a determination of *reasonableness*, but, in determining Fourth Amendment coverage as a threshold matter, the primary focus is upon the interest to be protected, rather than upon the means of vio-

lating it. (See Amsterdam, *supra*, 58 Minn.L.Rev. at p. 365; *People v. Arno, supra*, 90 Cal.App.3d at p. 511.)

Consistent with *Katz'* determination as to the scope of the Fourth Amendment are subsequent decisions by California courts, as well as those of other jurisdictions, finding "searches" in a wide variety of "nonintrusive" contexts. Thus, in *People v. Hyde* (1974) 12 Cal.3d 158, 164 [115 Cal.Rptr. 358, 524 P.2d 830], this court found that a magnetometer at an airport, "though minimally intrusive, unquestionably operates to search individuals within the meaning of the Fourth Amendment" since it "reveals the presence of metal objects in areas under personal control as to which the individual maintains a reasonable expectation of privacy and freedom from governmental inspection."[7]

Similarly, police use of binoculars to observe the interior of an office or a home has been held to be a search. (See, e.g., *People v. Arno, supra*, 90 Cal.App.3d 505; *United States v. Kim* (D. Hawaii 1976) 415 F.Supp. 1252.) Such activity obviously is not "intrusive" in any sense except as a "violation" of privacy rights. And, too, the attachment of an electronic "beeper" to the outside of a suspect's vehicle to track its movement triggers Fourth Amendment scrutiny. (*United States v. Michael* (5th Cir. 1980) 622 F.2d 744.)

*Katz* and its progeny would seem to compel the conclusion that a search occurs when a specially trained detector dog is used by police to determine whether luggage contains contraband hidden within. Clearly, the use of the dog "operates to search" the luggage and "reveals the presence" of contraband inside. (Cf., *People v. Hyde, supra*, 12 Cal.3d at p. 164.) As a Fourth Amendment matter, therefore, this police activity "violates" or "intrudes upon" whatever justifiable expectation of privacy an individual may have in the contents of his luggage.

That there is in fact a constitutionally justifiable privacy right as to the contents of luggage is no longer in doubt. (*Arkansas v. Sanders, supra*, 442 U.S. 753; *United States v. Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476]; *People v. Minjares* (1979) 24 Cal.3d 410 [153 Cal.Rptr. 224, 591 P.2d 514], cert. den. 444 U.S. 887 [62 L.Ed.2d 117, 100 S.Ct. 181]. See also *Robbins v. California* (1981) 453 U.S.

---

[7]The federal cases are in accord. (See, e.g., *United States v. Albarado* (2d Cir. 1974) 495 F.2d 799, 803; *United States v. Slocum* (3d Cir. 1972) 464 F.2d 1180, 1182; *United States v. Epperson* (4th Cir. 1972) 454 F.2d 769, 770, cert. den. 406 U.S. 947 [32 L.Ed.2d 334, 92 S.Ct. 2050].)

420 [69 L.Ed.2d 744, 101 S.Ct. 2841].) "[T]he very purpose of a suitcase is to serve as a repository for personal items when one wishes to transport them." (*Arkansas* v. *Sanders, supra*, 442 U.S. at p. 764, fn. omitted [61 L.Ed.2d at p. 245].) "[A]s we observed in [*United States* v. *Chadwick, supra*], luggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." (*Arkansas* v. *Sanders, supra*, 442 U.S. at p. 762 [61 L.Ed.2d at p. 244].)

Nor can Fourth Amendment coverage be denied under the portion of the *Katz* decision which excludes from constitutional protection that which "a person knowingly exposes to the public." The scent detected by the dog Corky was undetectable to human beings. The officers in this case were relying wholly on the perceptions of Corky and not on their own faculties. Consequently, the luggage's contents were not "exposed to the public," unless we are to interpret "the public" as meaning specially trained dogs. Nor can it be said that appellant "knowingly" exposed the contraband to the public, since he, not being a specially trained dog himself, would not have known that any aroma was escaping from his luggage.

It is perhaps true that appellant might have better ensured his privacy by resorting to extraordinary measures to prevent the escape of even one marijuana molecule. The Fourth Amendment does not require that of him, however. This court has specifically rejected the notion that "in order to preserve a modicum of privacy," a citizen need avail himself of "a light-tight, air-proof box."[8] (See *Lorenzana* v. *Superior Court, supra*, 9 Cal.3d at p. 637.) "[S]urely there comes a point where it can be said that a person has 'justifiably relied' upon the privacy of his premises even though he has not taken the extraordinary step of sealing off every minute aperture in that structure." (1 LaFave, *supra*, at pp. 253-254, fn. omitted.)

---

[8]Conceivably, it could be argued that knowledge by appellant of the widespread use of detector dogs would destroy his justifiable expectation of privacy. Justice Mosk has persuasively rebutted that argument, however: "such a concept would sanction an erosion of the Fourth Amendment by the simple and expedient device of its universal violation." (*People* v. *Hyde, supra*, 12 Cal.3d at p. 164, fn. 4; see also *Jones* v. *Latexo Independent School Dist., supra*, 499 F.Supp. at p. 234.)

"An actual, subjective expectation of privacy ... can neither add to, nor can its absence detract from, an individual's claim to fourth amendment protection. If it could, the government could diminish each person's subjective expectation of privacy merely by announcing half-hourly on television that 1984 was being advanced by a decade and that we were all forthwith being placed under comprehensive electronic surveil-

In concluding that the Fourth Amendment reaches the state's use of specially trained dogs to disclose the contents of areas where there is a justifiable expectation of privacy, I do not stand alone. A long line of California decisions is in accord,[9] as are decisions of other jurisdictions[10] and virtually all of the legal scholars who have written on this issue (cf., *ante*, fn. 1).

A majority of this court, however, does not agree. In an opinion remarkable for its failure to mention even once the *Katz* decision or any of the United States Supreme Court's cases that discuss the constitutional protections accorded luggage (*Chadwick, Sanders, Robbins*) or this court's own magnetometer decision (*Hyde*), the majority tenders two arguments as justifying its conclusion that there was no search.

First, it notes that a dog's nose "react[s] only to contraband" and thus is more discriminate than a magnetometer. However, as Judge Mansfield wrote in concurring opinion in *United States* v. *Bronstein*, "The fact that the canine's search is more particularized and discriminate than that of the magnetometer is not a basis for a legal distinction. The important factor is not the relative accuracy of the sensing device but the fact of the intrusion into a closed area otherwise hidden from human view, which is the hallmark of any search. If, as we have held, examination of carry-on luggage and individual passengers by a magnetometer or X-ray machine amounts to a search within the prohibition of the Fourth Amendment because it discloses hidden items within areas where there is a normal expectation of privacy, then the intrusion of a

---

lance. . . . Fortunately, neither *Katz* nor the fourth amendment asks what we expect of government. They tell us what we should demand of government." (Amsterdam, *supra*, 58 Minn.L.Rev. at p. 384; see also *United States* v. *Kim, supra*, 415 F.Supp. at pp. 1256-1257.)

[9]See cases collected in majority opinion, *ante*, at page 340.

[10]See, e.g., *United States* v. *Beale, supra*, 674 F.2d 1327; *Jones* v. *Latexo Independent School Dist., supra*, 499 F.Supp. 223; *State* v. *Elkins* (1976) 47 Ohio App.2d 307 [1 Ohio Ops.3d 380, 354 N.E.2d 716].

I would also note, as have the commentators, that many of the cases which describe their holdings in "no search" terms actually employ reasoning that indicates there was a search but a reasonable one. (See, e.g., *United States* v. *Klein, supra*, 626 F.2d at p. 27; *United States* v. *Sullivan* (4th Cir. 1980) 625 F.2d 9, 11-12, cert. den. 450 U.S. 923 [67 L.Ed.2d 352, 101 S.Ct. 1374] [use of dog justified by "precedent information and observations"]; *United States* v. *Bronstein, supra*, 521 F.2d at p. 463; *State* v. *Rogers* (1979) 43 N.C.App. 475 [259 S.E.2d 572, 576] [the use of a dog was not "an unreasonable invasion of defendant's privacy"]; *United States* v. *Solis, supra*, 536 F.2d at p. 882 ["the use of the dogs here was a reasonable response to the situation facing the officers"].)

sniffing dog in search of marijuana must also fall within that prohibition when directed at hidden areas where there is similarly a normal expectation of privacy." (521 F.2d at p. 464, citation omitted.)

The majority further contends that "the escaping smell of contraband from luggage may be likened to the emanation of a fluid leaking from a container." (Maj. opn., *ante*, at p. 342.) Thus, the argument runs, the "odor is detectable by the nose" in "'the airspace surrounding that luggage,'" an area to which constitutional protections assertedly do not apply. (Quoting *United States* v. *Goldstein, supra*, 635 F.2d at p. 361.) But, "this simply is not so." (1 LaFave, *supra*, at p. 283.) The "fluid" of which the majority speaks is visible to the human eye, but the "'sniffer dog' actually perceives odors *undetectable to humans*, much as an electronic listening device picks up sounds inaudible to the human ear." (*Jones* v. *Latexo Independent School Dist., supra*, 499 F.Supp. at p. 236, italics added.) This critical fact takes this case wholly outside the pale of the "plain smell" theory which the majority is attempting to invoke.

It should be noted that in *Katz*, as in the present case, the government agents were merely gathering that which "leaked" out of the phone booth into "the airspace surrounding" the telephone booth. Nevertheless, the Fourth Amendment was held to apply to their activities. Similarly, in *People* v. *Arno, supra*, 90 Cal.App.3d 505 and *United States* v. *Kim, supra*, 415 F.Supp. 1252, law enforcement officers using high powered binoculars to perceive events occurring inside an office and a home were merely detecting light waves which "leaked" out of the premises into the surrounding airspace. The Fourth Amendment was applicable notwithstanding. Finally, in *People* v. *Hyde, supra*, 12 Cal.3d 158, a deputy marshal used a magnetometer to detect distortions in magnetic lines of flux in the airspace surrounding luggage,[11] and this was held to be a search. The majority's reasoning in the present case is wholly inconsistent with this precedent.

The logic of the majority opinion "tortures" the plain smell doctrine. (See Comment, *supra*, 13 San Diego L.Rev. at p. 427.) Nor is this court's decision supported by a careful reading of the precedent upon which the majority purport to rely. (See, dis. opn., *ante*, at pp. 345-346

---

[11]"The magnetometer ascertains whether there is metal in the hidden space by detecting changes in the magnetic fields surrounding the area of the hidden space." (*United States* v. *Bronstein, supra*, 521 F.2d at p. 464 (conc. opn. of Mansfield, J.); see also *United States* v. *Lopez* (E.D.N.Y. 1971) 328 F.Supp. 1077, 1085, 1100, 1101.)

and fn. 10.) Today's holding frustrates the purposes and policies of the Fourth Amendment. (See dis. opn., *ante*, pt. I.) And in permitting the totally unrestrained use of trained dogs to sniff out the contents of areas where there is a justifiable expectation of privacy, it tends to undermine "the kind of open society to which we are committed." (1 LaFave, *supra*, at p. 286.) As the Ninth Circuit has counseled, nothing "invoke[s] the spectre of a totalitarian police state as much as the indiscriminate, blanket use of trained dogs at roadblocks, airports, and train stations." (*United States* v. *Beale, supra*, 674 F.2d at p. 1336, fn. 20.)

### III.

That the use of the detector dog constitutes a search within the meaning of the Fourth Amendment does not end our inquiry. The Fourth Amendment prohibits only those searches which are "unreasonable." (See *ante*, fn. 4.) It is to this question I must now turn.

There are several factors which weigh in favor of a finding of reasonableness. The search was apparently based upon police department policy, not upon the subjective discretion of an individual officer acting in the field. This policy was narrow in the sense that it apparently directed dog searches of only those domestic flights originating in Florida. As to these flights, the department had had some success in locating contraband in the past. The dog sniff search was directed at inanimate and unattended objects, not at persons or their immediate effects. Finally, the search was limited in scope in that it revealed only the presence of contraband, not any innocent items.

On the other hand, the search was conducted without a warrant. (But see *People* v. *Hyde, supra*, 12 Cal.3d at pp. 168-169.) It was surreptitious. By the officers' own accounts, there was "no particular information" about contraband in appellant's luggage or anywhere on the flight on which he arrived, nor any suspicions directed at any of the passengers. The asserted justification for the search was minimal, at best. It was premised primarily on a prediction based upon past experience that there was a three-quarters of 1 percent chance that *someone's* checked luggage would contain contraband.[12] (See maj. opn., *ante*, at p. 339.)

---

[12]This figure overstates the probability that appellant's luggage in particular would contain contraband. If it is conservatively estimated that each arriving flight has an average of 15 passengers with checked luggage, the police department's statistics would suggest that the likelihood of contraband in appellant's luggage was one-twentieth of 1 percent.

Finally, insofar as the search was sought to be justified by narcotics activity between Florida and San Diego, that justification was inapplicable to appellant. He was flying to San Diego from Ohio and had transferred to the Florida-to-San Diego flight in Dallas, Texas. The officers apparently were not concerned about such details.[13]

Upon balancing the competing factors, the dog search in this case cannot be upheld. In my view, the critical factor is the general, exploratory, dragnet nature of the search. Such searches have never been upheld by the courts of this state.[14]

The "general rule" is that Fourth Amendment intrusions must be justified by probable cause. (*Dunaway* v. *New York* (1979) 442 U.S. 200, 210 [60 L.Ed.2d 824, 834, 99 S.Ct. 2248].) *People* v. *Mickelson* (1963) 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658] and *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868] have permitted warrantless detentions and weapons frisks based upon a showing of less than probable cause, but "this Court has been careful to maintain [the] narrow scope" of this "exception to the general rule requiring probable cause." (*Dunaway* v. *New York, supra*, 442 U.S. at p. 210 [60 L.Ed.2d at p. 834].)

In California, we have been no less careful. In *People* v. *Hyde, supra*, this court refused to create a third level of suspicion, lower than that prescribed in *Terry* or *Mickelson*, in order to justify a minimally intrusive magnetometer search. (12 Cal.3d at p. 164.) As Justice Mosk wrote for the court, "if the level of suspicion required by *Terry* is reduced, there appears no discernible limitation to an extension permitting the wholesale frisking of the general public whenever a serious threat of crime emerges. California courts have consistently rejected such a blunderbuss approach since *Wirin* v. *Horrall*. (1948) 85 Cal.

[13]"Q. [By defense counsel] Well, you were concerned with this flight, because you thought the passengers were coming from Florida; isn't that right?
"A. [By Officer Flores] That's correct.
"Q. And you knew there was a stopover in Dallas?
"A. That's correct.
"Q. And were you concerned that some people—someone—that this baggage might have been something that got put on at Dallas, rather than came from Florida, or didn't that concern you?
"A. That does not concern me."
The evidence showed that appellant's luggage had a Dallas-Fort Worth Airport tag attached to it.
[14]General searches may legitimately occur in the context of an administrative search, but that doctrine is inapplicable to a search for evidence of crime, as in the instant case. (See generally, *People* v. *Hyde, supra*, 12 Cal.3d at pp. 165-169.)

App.2d 497 [193 P.2d 470] insisted upon Fourth Amendment protection for highway travellers." (12 Cal.3d at p. 164.)

It is unnecessary to decide which of the two standards—probable cause or *Terry-Mickelson*—is appropriate for analyzing dog sniff searches such as that present in this appeal. The circumstances of the search here meet neither test.

This court has already expressed "grave doubt" that "an approximately 6 percent probability of discovering weapons" would satisfy the *Terry* standard. (*People v. Hyde, supra,* 12 Cal.3d at p. 164.) It necessarily follows that a probability that is one-tenth or one-hundredth as strong as that considered in *Hyde* (see *ante,* fn. 13 and accompanying text) would be unable to meet that standard.

Moreover, I have serious reservations as to whether a purely statistical probability, unconnected to a particularized suspicion in a specific case, could ever by itself justify a search. I agree with those courts which have condemned dog sniff searches that were not based on "some preknowledge or reasonably strong suspicion that contraband is to be found in a particular location"[15] or on "[s]ome articulable facts which focus suspicion on specific [individuals]."[16] It is noteworthy that with the primary exception of two "border search" cases, the federal cases relied upon by the majority have not authorized a dog sniff search without some showing of particularized cause.

For each of these reasons, the dog sniff search in this case was unreasonable.

---

[15]*People v. Evans* (1977) 65 Cal.App.3d 924, 933 [134 Cal.Rptr. 436].

[16]*Jones v. Latexo Independent School Dist., supra,* 499 F.Supp. at page 236. See also, *id.,* at pages 240, 241.