Filed 11/25/13  P. v. Sherwin CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JUDAH MALACHI SHERWIN ,<br><br>        Defendant and Appellant. | A137075<br><br>(Sonoma County<br>Super. Ct. No. SCR600867) |

**I.**

**INTRODUCTION**

Following the denial of a motion to suppress evidence (Pen. Code, § 1538.5)[1], appellant Judah Malachi Sherwin pled no contest to one count of possession of marijuana for sale, and the prosecution moved to dismiss the remaining charge for transportation of marijuana.  On appeal, appellant challenges the constitutionality of the use of a police canine to establish probable cause, and the trial court's finding of probable cause based on the results of the canine's "alert" on appellant's storage unit.  We reject appellant's challenges, and affirm.

---

[1] Penal Code section 1538.5 allows a defendant to move to suppress evidence obtained in an improper search and seizure.  (*People v. Williams* (1999) 20 Cal.4th 119, 125, 129-131.)

1

## II.

## FACTS AND PROCEDURAL HISTORY

At about 6:15 p.m. on February 22, 2011, Sonoma County Deputy Sheriff Terrence White (Deputy White), a canine handler, responded to a call from the ABF shipping terminal on Dutton Avenue in Santa Rosa regarding a suspicious package. When Deputy White arrived at the terminal, the shipping manager, Jerry Sciortino, told the deputy that he was suspicious of a particular "U-Pack"[2] that was recently packed by appellant. The shipping manager told Deputy White that appellant had asked to use his own padlock, packed the shipment in about five minutes, and was shipping the U-Pack from terminal to terminal. The shipping manager explained that he was suspicious because he could smell the odor of marijuana on appellant's person, and because five minutes is far short of the average packing time for a U-Pack cube, which in his experience takes 30 minutes or more to complete. Further, the shipping manager explained to Deputy White that shipping a U-Pack from terminal to terminal is unusual because U-Packs are typically dropped off at locations such as residences. Based on this information, Deputy White retrieved his narcotics detective canine partner, Shadow, from his patrol car.

Shadow, a Belgian Malinois dog, was dual-trained to locate narcotics and engage in protection work. Shadow was trained to locate five specific odors: heroin, cocaine, methamphetamine, marijuana, and opium. In 2007, Shadow attended a 200-hour course with Deputy White in Southern California with where Shadow was trained and qualified to detect those five substances. Additionally, every year Shadow is certified by a third party at the California Narcotics Canine Association for proficiency. At the time of the encounter in this case, Shadow was seven years old, and since the start of Deputy White's handling of Shadow, Shadow had accurately alerted Deputy White to narcotics approximately several hundred times.

---

[2] A "U-Pack" is a cube-shaped shipping container used to move items, and measures approximately eight-by-eight-by-six feet.

After Deputy White retrieved Shadow from his patrol car, he, Shadow and Sciortino went to the west side of the ABF shipping terminal where several U-Packs were located. Deputy White testified that at that time, he told Sciortino that he did not want Sciortino to identify which U-Pack belonged to appellant. Instead, Deputy White wanted to leave Shadow to do a "blind test" wherein he would search the entire area for narcotics. Once Deputy White gave Shadow the command to search, Shadow began sniffing the far west side. Shadow did not indicate that narcotics were present in the first U-Pack.

At the second U-Pack, Shadow smelled the seam of the door, and then proceeded to the right-hand side of the U-Pack. Shadow then went towards the upper vent and laid down on the ground, which is Shadow's signal that he has located one of the odors he was trained to detect. Deputy White confirmed that the second U-Pack was the same one rented by appellant, and directed Sciortino to move that U-Pack to a secured location pending issuance of a search warrant. Deputy White then prepared a request for a search warrant for the U-Pack based on Shadow's "alert" and his interview with Sciortino. The warrant was issued, and Deputy White gave the warrant to another detective to execute.

A motion to suppress the evidence found as a result of the search was made by appellant in the trial court. In connection with that motion, appellant argued that a police canine alert to the presence of an odor of controlled substances is not a reliable indicator of the actual presence of a controlled substance, because of residual odors. For this reason appellant urged the trial court to find that Shadow was "not well trained," and thus, to conclude that the search was invalid under the Fourth Amendment. The trial court disagreed, finding *United States v. Place* (1983) 462 U.S. 696 (*Place*), to be dispositive, as it "justifies the use of narcotics detection dogs." The court then suspended imposition of sentence, and placed appellant on three years formal probation with conditions.

After the denial of the motion to suppress, appellant pled no contest to one count of violating Health and Safety Code section 11359, and the prosecution dismissed the other count, an alleged violation of Health and Safety Code section 11360,

3

subdivision (a).  The court then suspended imposition of sentence and placed appellant on three years supervised, formal probation with conditions.

## III.

## DISCUSSION

### A. Standard of Review

In reviewing a ruling on a motion to suppress evidence, to the extent a trial court's findings resolve questions of fact, they must be upheld on appeal if supported by substantial evidence.  (*People v. Mayberry* (1982) 31 Cal.3d 335, 339 (*Mayberry*).)  The power to judge credibility, weigh evidence, and draw factual inferences is vested in the trial court.  (*People v. James* (1977) 19 Cal.3d 99, 107.)  However, in reviewing the reasonableness of the challenged police conduct, such as whether a search or seizure is reasonable under the Fourth Amendment, we exercise our independent judgment.  (*People v. Hoyos* (2007) 41 Cal.4th 872, 891.)  " 'The reason is plain: " 'it is the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness.' " '  [Citation.]"  (*People v. Stillwell* (2011) 197 Cal.App.4th 996, 1004.)

### B. Denial of the Motion to Suppress

### 1. The Fourth Amendment and Police Canine Olfactory Alerts[3]

The Fourth Amendment to the United States Constitution provides "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  (U.S. Const., 4th Amend.)  This guarantee has been incorporated into the Fourteenth Amendment and is applicable to the states.  (*People v. Camacho* (2000) 23 Cal.4th 824, 829-830.)  The United States Supreme Court has considered whether a sniff test implicates the protections of the Fourth Amendment.  In *Place*, the court concluded that a sniff test by a well-trained drug

---

[3] The parties and courts have used a number of phrases to describe law enforcement's use of canines trained to detect controlled substances by smell.  We will hereinafter adopt the United States Supreme Court's usage by referring to the search in this case as relying on a "sniff test."  (*Place*, *supra*, 462 U.S. at p. 699.)

4

detecting dog was "*sui generis*," and therefore not a search. (*Place*, *supra*, 462 U.S. at p. 707, original italics.) More recently, the court noted that "the use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests," and therefore does not violate the Fourth Amendment. (*Illinois v. Caballes* (2005) 543 U.S. 405, 409.) Similarly, our Supreme Court has concluded that defendants have no reasonable expectation of privacy in odors emanating from their concealed contraband such that a sniff test is flatly prohibited, even if there is no specific suspicion that narcotics are present. (*Mayberry*, *supra*, 31 Cal.3d at p. 342 [in the context of an airport luggage sniff test].)

Appellant relies on the two-part test from Justice Harlan's concurring opinion in *Katz v. United States* (1967) 389 U.S. 347, 360, to contend that the U-Pack in this case carries a stronger expectation of privacy than luggage at a public airport, or a vehicle during a traffic stop, which were the factual circumstances involved in *Place*, *supra*, 462 U.S. 696 and *Illinois v. Caballes*, *supra*, 543 U.S. 405.

Appellant errs in reading our highest court's decisions so narrowly. While the sniff test in *Place* involved luggage, the court did not limit its analysis of sniff tests only to that specific factual context. (*Place*, *supra*, 462 U.S. at p. 707.) The court reasoned broadly: "A 'canine sniff' . . . does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search." (*Ibid*.)

The underlying rationale in *Place* rested on the notion that, unlike a more traditional physical police search, sniff tests disclose only the presence or absence of narcotics, contraband items, without disclosure of other personal information about the contents of a closed container. (*Place*, *supra*, 462 U.S. at p. 707.) As noted by the *Place* court: "This limited disclosure also ensures that the owner of property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods. [¶] . . . We are aware of no other investigative procedure that is so

5

limited in both the manner in which the information is obtained and in the content of the information revealed by the procedure." (*Ibid*.)

Assuming that appellant had a generalized expectation of privacy in the contents of his U-Pack, appellant fails to show how a minimally intrusive sniff test used here—designed to detect only illegal narcotics—undermines that expectation of privacy. The United States Supreme Court has clearly enunciated the principle that "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.' " (*United States v. Jacobsen* (1984) 466 U.S. 109.) Therefore, while a person may have a reasonable expectation of privacy in a U-Pack with legally permissible contents, the same is not true for U-Packs that are shown through a minimally intrusive dog sniff test to house narcotics and contraband.

In reaching this conclusion we note that the content of appellant's U-Pack was never exposed to the public. Rather, the canine in this case—Shadow—stayed outside of the U-Pack at all times, and only sniffed the seams of the door and air vent. At no time did Deputy White go inside appellant's U-Pack without a warrant or permission. Accordingly, even if appellant had an expectation of privacy in his U-Pack, given the limited disclosure made by Shadow and the minimally intrusive nature of Shadow's sniff test, that sniff test did not constitute an improper search under the Fourth Amendment.

As he did below, appellant also argues that Shadow's alert was not reliable as a basis for probable cause because of Shadow's inability to distinguish between residual odors of illegal substances, versus illegal substances actually present at the time of the search. This same argument was made and rejected just this past term by the United States Supreme Court in *Florida v. Harris* (2013) ___ U.S. ___, 133 S.Ct. 1050, 1056-1057 (*Harris*). In *Harris*, Harris's attorney challenged the canine's certification and performance in the field. (*Id.* at p. 1054.) The trial court disagreed, and found that the officer did have probable cause to search the defendant's truck. (*Ibid*.) On appeal, the Florida Supreme Court reversed, holding that " '[W]hen a dog alerts,' . . . 'the fact that

6

the dog has been trained and certified is simply not enough to establish probable cause.' [Citation.]" (*Id.* at p. 1055.)

The United States Supreme Court granted certiorari, and on February 19, 2013, after appellant's opening brief was filed in this case, a unanimous court overturned the Florida Supreme Court's holding. The court opined that the Florida Supreme Court's requirement for assessing the reliability of a drug-detection dog "flouted [the] established approach to determining probable cause." (*Harris*, *supra*, 133 S.Ct. at p. 1056). In its ruling, the Supreme Court specifically addressed the issue of dog alerts to residual odors in footnote 2, explaining "The Florida Supreme Court treated a dog's response to residual odor as an error, referring to the 'inability to distinguish between [such] odors and actual drugs' as a 'facto[r] that call[s] into question [the canine's] reliability. [Citation.]' But that statement reflects a misunderstanding. A detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone (just as a police officer's much inferior nose detects the odor of marijuana for some time after a joint has been smoked). In the usual case, the mere chance that the substance might no longer be at the location does not matter; a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime (like the precursor chemicals in Harris's truck) will be found." (*Id.* at pp. 1056-1057, fn. 2.) Thus, it is plain that this footnote answers and rejects appellant's argument that residual odors cause a false alert which precludes a finding of probable cause.

Answering a more general proposition posed by appellant, the court in *Harris* expressly clarified that, "a well-trained dog's sniff alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found." (*Harris*, *supra*, 133 S.Ct. at pp. 1056-1057, fn. 2.) Such language expresses the court's view that a well-trained dog's alert in and of itself can establish probable cause, because it shows a "fair probability" that narcotics are present. According to the *Harris* court, it matters not whether the narcotic substance is actually present when there is a positive sniff test. (*Ibid.* ["In the usual case, the mere chance that the substance

7

might no longer be at the location does not matter"].)  The relevant consideration is whether a sniff test establishes a fair probability that drugs or evidence of a drug crime are present, as some circumstances surrounding a particular sniff test may undermine the case for probable cause—such as an officer cuing the dog (consciously or not), or if the police team was working under unfamiliar conditions.  (*Id.* at pp. 1057-1058.)  Therefore, as the *Harris* court pointed out, it is important that the defendant be afforded the opportunity to challenge the dog's reliability, whether by cross-examining the testifying officer or by introducing defendant's own fact or expert witnesses.  (*Ibid.*)

In the instant case, however, there is no indication or allegation that Deputy White cued Shadow—indeed, Deputy White asked Shadow to search the general area with multiple U-Packs, not solely the suspected U-Pack.  Furthermore, there were no unfamiliar conditions that would hinder Shadow's ability to alert accurately.  Although appellant contends that Deputy White "provided no details about the course the dog had attended or what was involved in his annual certifications," the record provides ample evidence that Shadow was fully trained, certified, and had the experience to support his sniff test results.  Deputy White not only testified that Shadow attended a 200-hour training course in Southern California in 2007, but also that each year Shadow has been certified by the California Narcotics Canine Association for proficiency.  Deputy White made clear that Shadow had been trained to detect five specific narcotics odors.  At the time of the encounter in this case, Shadow was seven years old, and since the start of Deputy White's handling of Shadow, Shadow had accurately alerted Deputy White to narcotics approximately several hundred times.

The Supreme Court found that the 120-hour training of the canine in *Harris* to be sufficient under a training regime similar to Shadow's, which included certification from an outside company, ample work with a police trainer, and a history of accurate positive alerts.  (*Harris*, *supra*, 133 S.Ct. at p. 1058.)  Shadow's training and experience proven at the suppression hearing through the testimony of Deputy White clearly exceeds even that level of training and proficiency.

For all of these reasons, the trial court did not err in its finding that Shadow's sniff test was reliable, and thus a proper basis for a finding of probable cause to issue a warrant.

## 2. *Probable Cause Determination for Detention of U-Pack*

Appellant additionally contends that the "sequestering of his U-Pack cube into a secured area pending issuance of a warrant" was conducted without probable cause in violation of the Fourth Amendment. (Fn. omitted.) Again, we disagree.

Probable cause is established where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238.) A police officer has probable cause to conduct a search when the facts available to him would " ' "warrant a [person] of reasonable caution in the belief" ' that contraband or evidence of a crime is present. [Citations.]" (*Harris*, *supra*, 133 S.Ct. at p. 1055.) The test for probable cause is not reducible to " 'precise definition or quantification.' [Citation.]" (*Ibid.*) All that the United States Supreme Court has required for a showing of probable cause is the kind of " 'fair probability' " on which 'reasonable and prudent [people,] not legal technicians, act.' [Citation.]" (*Ibid.*) Notably, California appellate courts have found that a dog alert can provide the probable cause needed for a search warrant. (*People v. Bautista* (2004) 115 Cal.App.4th 229, 236, citing *United States v. Spetz* (9th Cir. 1983) 721 F.2d 1457, 1464; *Estes v. Rowland* (1993) 14 Cal.App.4th 508, 532.) In evaluating whether the state has made the requisite showing for of probable cause, we adjudge the situation based on the totality of the circumstances. (*Harris*, *supra*, 133 S.Ct. at p. 1055.)

Having concluded that the sniff test provided Deputy White with probable cause to suspect the U-Pack contained contraband, that probable cause was sufficient legally to justify his decision to sequester appellant's U-Pack until a search warrant could be secured. However, quite apart from relying only on Shadow's sniff test, here Deputy White had probable cause to take this action even in the absence of the sniff test result.

The deputy's interview with Sciortino revealed suspicious facts about appellant, facts which appellant has not challenged. The shipping manager smelled the odor of

9

marijuana on appellant's person. He also told Deputy White that appellant had asked to use his own padlock, packed the shipment in about five minutes, and was shipping the U-Pack from terminal to terminal. The facts do not stand alone, as Sciortino added that in his experience, the average customer's packing time for a U-Pack is 30 minutes or more; and that U-Packs are typically dropped off at locations such as residences, not another U-Pack terminal. Appellant counters that Deputy White should not have believed the accounts of Sciortino because "he [White] had never met the shipping manager before[,] and thus had no foundation upon which to consider the manager's opinions and/or observations reliable." However, conversely, Deputy White did not have any information or foundation to believe that Sciortino's observations of appellant were *not* reliable. Appellant has cited no persuasive authority requiring law enforcement officers to know or meet a particular individual before the officer can credit that person's account of suspicious activity as credible. Thus, appellant's argument fails.

Based on all of these facts, adjudged under the totality of the circumstances standard, there is no doubt that Deputy White acted reasonably and prudently when he decided to request that appellant's U-Pack be moved to a secure area of the terminal until he could obtain a search warrant. (*Harris*, *supra*, 133 S.Ct. at p. 1055.)

## IV.

## DISPOSITION

For the foregoing reasons, the judgment is affirmed.

10

_____
RUVOLO, P. J.

We concur:


_____
REARDON, J.


_____
RIVERA, J.

11